# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| T & E CHICAGO LLC, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | CLASS ACTION |
| THE CINCINNATI INSURANCE COMPANY, | ) ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff, T & E Chicago LLC ("Plaintiff"), individually, and on behalf of all others similarly situated, by and through counsel, brings this action against Defendant, The Cincinnati Insurance Company ("Cincinnati"), and states as follows:

### INTRODUCTION

1.     Plaintiff is owner and operator of a tavern located in the Logan Square neighborhood of Chicago that had been forced, by orders issued by the State of Illinois and the City of Chicago, to cease its operations—through no fault of its own—as part of the State's and City's efforts to slow the spread of the COVID-19 global pandemic. The closures mandated by those orders presented an existential threat to this small, local business.

2.     The novel coronavirus, SARS-CoV-2, is a highly contagious virus which has rapidly spread and continues to spread around the world and across the United States. The SARS-CoV-2 virus remains stable and transmittable in aerosols and on various surfaces for prolonged periods of time. The illness caused by SARS-CoV-2 is called COVID-19 (Coronavirus Disease 2019).

3.      On March 11, 2020, the COVID-19 outbreak—which had first been identified several months prior—was designated as a worldwide pandemic by the World Health Organization (WHO). Director General Tedros Adhanom Ghebreyesus of WHO declared: "WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction. We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

4.      On March 13, 2020, the President of the United States also declared the pandemic to be of sufficient severity to warrant an emergency declaration for all States, territories, and the District of Columbia.

5.      On March 16, 2020, the Centers for Disease Control and Prevention, and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" for stopping the spread of COVID-19. This guidance advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.[2]

6.      Shortly thereafter, many state government administrations across the nation recognized the need to take steps to protect the health and safety of their residents from the human to human and surface to human spread of COVID-19.

7.      Governors from states across the nation began to publicly announce an escalating series of various civil authority, "stay at home" orders that limited public gatherings, deemed

---

[1]     *See*   https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2]     https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

certain business sectors "essential," mandated the partial or complete closure of normal business operations for businesses not deemed "essential," and placed stringent requirements on many businesses deemed "essential" in order for them to continue operating.

8. Countless businesses in "stay at home" order states across the nation were forced by law to overhaul their business models, scale back their business dramatically, or shutter—either temporarily or permanently. Foot traffic in all businesses also took a sharp downturn as the public began to avoid public spaces of all types, further harming businesses' ability to stay afloat. Furloughs and layoffs were rampant in the private sector. Unemployment insurance filings reached record levels. The major stock indices plummeted, erasing trillions of dollars in shareholder value and retirement accounts.

9. The result of these far-reaching restrictions and prohibitions was catastrophic for most non-essential businesses, especially restaurants and other foodservice businesses, along with many other retail establishments, entertainment venues, and other small, medium, and large businesses who were forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatened their survival.

10. On March 15, 2020, Illinois Governor Pritzker issued an order first closing to the public all restaurants, bars, and movie theaters in Illinois in an effort to address the ongoing COVID-19 pandemic. Governor Pritzker thereafter ordered all "non-essential businesses" to close and has issued further orders extending the stay-at-home Closure Order period several times.

11. As a result of the Closure Orders, Plaintiff was forced to halt ordinary operations, resulting in substantial lost revenues and forcing Plaintiff to furlough or lay off employees.

12. Most businesses insure against such catastrophic events like the unforeseen COVID-19 pandemic through all-risk commercial property insurance policies. These policies

promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property. This coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies.

13.     To protect its business from situations like these, which threaten its operations and livelihood based on factors wholly outside of its control, Plaintiff obtained business interruption insurance from Cincinnati. A copy of that policy, Policy No. 05EPP0497216, with effective dates from July 20, 2019 to July 20, 2020 (the "Policy"), is attached as Exhibit A.

14.     Cincinnati purports to understand the reason insureds like Plaintiff obtain business interruption coverage. Cincinnati thus promises that "[w]hen it comes to paying claims, we'll look for coverage-not exceptions, helping to keep your business running in the event of a claim."[3] Cincinnati markets its business interruption insurance as helping to cover "loss of income and necessary extra expenses you incur to keep your business operating," including lost profits, payroll, taxes, and other operating expenses.[4] Cincinnati assures prospective customers that Cincinnati is "everything insurance should be."[5]

15.     Accordingly, Plaintiff purchased business interruption insurance from Cincinnati. Plaintiff also dutifully paid premiums to Cincinnati for that coverage, so that when the

---

[3]     Protection for Businesses and Organizations: Fulfilling our Promises, The Cincinnati Insurance Company, available at https://www.cinfin.com/business-insurance.

[4]     Protection for Your Commercial Property, The Cincinnati Insurance Company, available at https://www.cinfin.com/business-insurance/products/property-insurance.

[5]     About Us, The Cincinnati Insurance Company, available at https://www.cinfin.com/about-us.

4

unimaginable occurred, Plaintiff would be protected. Plaintiff purchased an "all risks" Policy that cover every one of those unimaginable risks unless the policy exclusions remove that risk from coverage. And, nothing in plaintiff's Policy excludes viruses from coverage. Nor does anything in the Policy exclude governmental closure orders.

16.     But despite Cincinnati's express promise in its Policy to cover Plaintiff's business interruption losses in circumstances when it was forced to curtail its operations and close its premises to the public by the series of Executive Orders issued by the Governor to address a spreading pandemic, Cincinnati issued a blanket denial to Plaintiff for any losses related to the pandemic and the Closure Orders—without first conducting any meaningful coverage investigation, let alone a "reasonable investigation based on all available information" as required under Illinois law.

17.     The only rationale Cincinnati provided to Plaintiff for its categorical proclamation that Plaintiff's losses are not covered, is its assertion that the presence of the coronavirus, which led to the Closure Orders that prohibited Plaintiff from operating its businesses, did not constitute "direct physical damage" or "direct physical loss." *See* April 15, 2020 Denial Letter attached hereto as "Exhibit B."

18.     But Cincinnati's conclusory statement that the actual or potential presence of a harmful, contagious substance like SARS-CoV-2 does not result in property damage is contrary to the law in Illinois. Illinois courts have long held that the presence of a dangerous substance in a property constitutes "physical loss or damage." *See, e.g.*, *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co.*, 720 N.E.2d 622, 625–26 (Ill. Ct. App. 1999), as modified on denial of reh'g (Dec. 3, 1999).

19.     In a recent decision, the Pennsylvania Supreme Court reached a comparable

conclusion, finding that the COVID-19 pandemic constituted a natural disaster causing direct property damage to all businesses impacted. *See Friends of Danny DeVito, et al. v. Tom Wolf, Governor, et al.*, No. 68 MM 2020, 21 n.11, 2020 WL 1847100, at *10 n.11 (Pa. Apr. 13, 2020).

20. Moreover, unlike many commercial property policies available in the market, the Policy sold by Cincinnati to the Plaintiff did not include an exclusion for loss caused by a virus or a pandemic. Thus, Plaintiff reasonably expected that the insurance it purchased from Cincinnati included coverage for property damage and business interruption losses caused by viruses like the SARS-CoV-2 coronavirus.

21. If Cincinnati had wanted to exclude pandemic-related losses under the Plaintiff's policy—as many other insurers have done in other policies—it easily could have attempted to do so on the front-end with an express exclusion. Instead, Cincinnati waited until after it collected Plaintiff's premiums, and after a pandemic and the resulting Closure Orders caused catastrophic business losses to Plaintiff, to try to limit its exposure through its erroneous assertion that the presence of the coronavirus is not "physical loss" and therefore is not a covered cause of loss under its policies.

22. The fact that the insurance industry has created specific exclusions for pandemic-related losses under similar commercial property policies undermines Cincinnati's assertion that the presence of a virus, like the coronavirus, does not cause "physical loss or damage" to property.

23. Indeed, if a virus could never result in a "physical loss" to property, there would be no need for such an exclusion. Moreover, Cincinnati's assertion ignores the fact that their policies promised to provide coverage for losses incurred due to government actions "taken in response to dangerous physical conditions," even if those dangerous physical conditions cause damage to property at locations other than those insured under their policies.

6

24. Thus, Cincinnati's wholesale, cursory coverage denials were arbitrary and unreasonable, and inconsistent with the facts and plain language of the Policy it issued to Plaintiff. These denials appear to be driven by Cincinnati's desire to preempt its own financial exposure to the economic fallout resulting from the COVID-19 pandemic crisis, rather than to initiate, as Cincinnati is obligated to do, a full and fair investigation of the claims and a careful review of the policy it sold to Plaintiff in exchange for valuable premiums.

25. Cincinnati's interpretation of the Policy is wrong, and its denial for losses caused by limitations on the physical use and access to Plaintiff's property breached its obligations under the contract of insurance.

26. As a result of Cincinnati's wrongful denial of coverage, Plaintiff files this action seeking a declaratory judgment establishing that it is entitled to receive the benefit of the insurance coverage it purchased, and ordering Cincinnati to pay Plaintiff's lost business income, extra expenses, and other business losses Plaintiff has sustained in light of the COVID-19 pandemic and actions by governmental authorities requiring closure of Plaintiff's covered business premises. This Complaint also seeks damages for breach of contract, for breach of good faith and fair dealing, and for bad faith claims handling under 215 ILCS 5/155.

**THE PARTIES**

27. Plaintiff, T & E Chicago LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Plaintiff owns and operates the Navigator Taproom, a tavern located in the Logan Square neighborhood of Chicago.

28. Defendant, Cincinnati, Cincinnati is an Ohio insurance company, with its principal place of business located in Ohio. Cincinnati is engaged in the business of selling insurance contracts to commercial entities such as Plaintiff in Illinois and elsewhere.

## JURISDICTION & VENUE

29.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

30.     This Court has personal jurisdiction over Defendants pursuant to the Illinois "long arm statute," 735 ILCS 5/2-209, because Defendants have submitted to jurisdiction in this state by: (a) transacting business in Illinois; (b) contracting to insure a person, property or risk located within Illinois at the time of contracting; and (c) making a contract substantially connected with Illinois. *See* 735 ILCS 5/2-209(1), (4), (7). In addition, Defendants exercise substantial, systematic and continuous contacts with Illinois by doing business in Illinois, serving insureds in Illinois, and seeking additional business in Illinois.

31.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the Policy with respect to the loss of business arising from the civil authority event detailed below.

32.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omission giving rise to Plaintiff's claims occurred within the Northern District of Illinois.

## FACTUAL ALLEGATIONS

### The COVID-19 Pandemic

33.     SARS-CoV-2 is a highly contagious coronavirus, an organic human pathogen, which has rapidly spread around the world. It remains stable and transmittable in aerosols and on various surfaces for prolonged periods of time. The illness caused by SARS-CoV-2 is called

COVID-19 (Coronavirus Disease 2019).

34.     SARS-CoV-2 emerged in Wuhan, China, in December 2019. In January 2020, the first known case of a U.S. resident infected by SARS-CoV-2 was reported in the State of Washington. SARS-CoV-2 quickly spread and by March 2020, cases had been confirmed in many areas across the United States.

35.     SARS-CoV-2 is a coronavirus that is believed to be primarily spread through respiratory droplets[6] and by "fomite"— meaning objects, materials, or surfaces that have been physically contaminated or infected by respiratory droplets—and it can survive on surfaces for extended periods of time. Recent information on the CDC's website provides that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.[7]

36.     Researchers estimate that the number of people that an individual infected with SARS-CoV-2 will go on to infect—or basic reproduction number ($R_o$ or R-naught) – is between 3.3 and 6.5.[8] The higher the Ro figured, the faster an infectious disease will spread. By comparison,

---

[6]     According to the World Health Organization ("WHO"): "People can catch COVID-19 from others who have the virus. The disease can spread from person to person through small droplets from the nose or mouth which are spread when a person with COVID-19 coughs or exhales. These droplets land on objects and surfaces around the person. Other people then catch COVID-19 by touching these objects or surfaces, then touching their eyes, nose or mouth." *See* Q&A on coronaviruses (COVID-19), "How does COVID-19 spread?" World Health Organization (Apr. 16, 2020), available at https://www.who.int/news-room/q-a-detail/qacoronaviruses.

[7]     *How COVID-19 Spreads*, Ctr. for Disease Control and Prevention (April 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[8]     *See* Ying Liu *et al.,* The reproductive number of COVID-19 is higher compared to SARS coronavirus, Journal of Travel Medicine (Feb. 13, 2020), available at https://academic.oup.com/jtm/article/27 /2/taaa021/5735319.

the $R_o$ estimate for the seasonal flu is 1.3,[9] and for Ebola during a prior catastrophic epidemic was 1.5.[10]

37.     Droplets containing COVID-19 infect a variety of surfaces and objects for a period of a hours, days, or weeks, if not longer. According to a scientific study in The New England Journal of Medicine, the coronavirus responsible for the COVID-19 disease—SARS-CoV-2—can physically infect and survive on surfaces for up to 72 hours.[11] Another scientific study documented in the Journal of Hospital Infection found that human coronaviruses, such as SARS-CoV-2, can remain infectious on inanimate surfaces at room temperature for up to nine days.[12]

38.     Other recent scientific evidence shows that COVID-19 can survive and remain virulent on stainless steel and plastic for three to six days; on glass and banknotes for three days; and on wood and cloth for 24 hours.[13] These materials are prevalent and unavoidable throughout

---

[9]     *See* Matthew Biggerstaff *et al.,* Estimates of the reproduction number for seasonal pandemic, and zoonotic influenza: a systematic review of the literature, BMC Infection Diseases (Sept. 4, 2014), available at https://bmcinfectdis.biomedcentral.com/articles/1 O. l 186/1471-2334-14-480.

[10]    *See* Adnan Khan *et al.,* Estimating the basic reproductive ratio for the Ebola outbreak in Liberia and Sierra Leone, Infectious Diseases of Poverty (Feb. 24, 2015), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4347917/.

[11]    Neeltje van Doremalen, Ph.D., et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, The New England Journal of Medicine (April 16, 2020), available at https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973?articleTools=true.

[12]    *See* G. Kampf, et al. *Persistence of coronavirus on inanimate surfaces and their inactivation with biocidal agents* (February 06, 2020), available at https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3.

[13]    *See* Neeltje van Doremalen *et al.,* "Aerosol and Surface Stability of SARS-CoV-2 as Compared to SARS-Co V-1," New England Journal of Medicine (Mar. 17, 2020), available at https://www.nejm.org/doi/pdf/10.l056/NEJMc2004973; Alex W.H. Chin *et al.,* "Stability of SARS-Co V-2 in different environmental conditions," The Lancet Microbe (Apr. 2, 2020), available at https://doi.org/10.1016/S2666-5247(20)30003-3.

Plaintiff's facility.

39.     Emerging research on the virus and recent reports from the CDC even suggest that the SARS-CoV-2 strains physically infect and can stay alive on surfaces for more than two weeks, a characteristic that renders property exposed to the contagion potentially unsafe and dangerous. Specifically, after inspecting a cruise ship inhabited by passengers who carried SARS-CoV-2, the CDC reported that the virus was detectable on various surfaces inside the cruise ship up to 17 days after passengers had vacated the cabins.[14]

40.     One report based on recent research even suggests that SARS-CoV-2 can persist on surfaces under certain commonplace conditions for up to 28 days.[15]

41.     SARS-CoV-2 reportedly has an incubation period of 2-12 days, during which time it can be transmitted even before symptoms develop. Symptoms often include fever, cough, shortness of breath, and, in severe cases, pneumonia.

42.     For these reasons, "[p]ublic health experts and elected officials have emphasized again and again that social distancing is the best tool … to slow the coronavirus outbreak."[16]

43.     On January 21, 2020, the CDC reported the first confirmed American COVID-19 case in the State of Washington.

---

[14]     *See* Leah E. Moriary *et al.,* "Public Health Responses to COVID-19 Outbreaks on Cruise Ships-Worldwide, February-March 2020," 69 *Morbidity and Mortality Weekly Report* 347 (Mar. 23, 2020), available at https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf.

[15]     Gunter Kampf *et al.,* Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents, 104 J. Of Hospital Infection 246 (2020), available at https:/ /www.journalofhospitalinfection.com/article/SO 195-6701 (20)30046-3/fulltext.

[16]     *See* Yuliya Pashina-Kottas, *et al.*, "This 3-D Simulation Shows Why Social Distancing Is So Important," *The New York Times* (Apr. 21, 2020), available at https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html.

44. On March 9, 2020, Illinois Governor Pritzker declared all counties in the State of Illinois as a disaster area, specifically "in response to the outbreak of COVID-19."

45. On March 11, 2020, the WHO declared COVID-19 to be a global pandemic.

46. On March 13, 2020, the President of the United States declared a national emergency as a result of the COVID-19 outbreak.

47. On March 15, 2020, Governor Pritzker issued Executive Order 2020-07 which declared that a public health emergency existed throughout the State of Illinois as a result of the COVID-19 outbreak in the United States and a confirmed report that SARS-CoV-2 was in Illinois, and which closed to the public all restaurants, bars, and movie theaters in Illinois beginning on March 16, 2020 and continuing through March 30, 2020, in an effort to address the ongoing COVID-19 pandemic.[17]

48. This Closure Order was in direct response to the " COVID-19 outbreak" and the physical presence of SARS-CoV-2 on property throughout the State of Illinois. It specifically stated that the goal was to respond to the rapid spread of COVID-19 by restricting in-person interactions in environments with "frequently used services in public settings, including bars and restaurants…" The March 15th Closure Order also stated that "the ongoing spread of COVID-19 and the danger the virus poses to the public's health and wellness require the reduction of on-premises consumption of food and beverages." The March 15th Closure Order thus recognized that the spread of COVID-19 throughout Illinois could not be sufficiently abated by cleaning and disinfecting frequently used surfaces in public settings; it mandated that access to such surfaces be suspended altogether.

---

[17]     https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-07.aspx.

49.     On March 16, 2020, Chicago Mayor Lightfoot issued guidance for restaurants and bars to comply with the Governor's Closure Order. That guidance barred "the consumption of food or beverage. . . inside [any] restaurant or bar" and the congregation of persons "inside or outside [any] restaurant or bar." At "midnight" Chicago would begin "any necessary enforcement measures."[18]

50.     A few days later, on March 20, 2020, Governor Pritzker issued Executive Order 2020-10, which, among other things, prohibited any gathering of more than ten people, except for limited activities identified in that order, and required individuals to stay in their home or place of residence, except to conduct essential activities, essential governmental functions, or to operate essential businesses, and ordered all "non-essential businesses" to close through April 7, 2020.[19]

51.     On March 25, 2020, Mayor Lightfoot issued a press release reminding Chicagoans of the "critical importance" of complying with the Governor's stay-at-home order. The press release noted that the Chicago Police Department is "empowered to enforce the Governor's order through citations and additional measures."[20]

52.     On April 1, Governor Pritzker again declared all counties in the State of Illinois as a disaster area, specifically "in response to the exponential spread of COVID-19."[21]

53.     On April 1, 2020, Governor Pritzker issued Executive Order 2020-18, which continued and extended the prior Executive Orders issued in response to the outbreak of COVID-

---

[18]     Press Release, City of Chicago, City of Chicago Issues Guidance and Support for Covid-19 Restrictions on Restaurant Dining and Taverns (Mar. 16, 2020).

[19]     https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-10.aspx.

[20]     Press Release, City of Chicago, Mayor Lightfoot Reminds Residents of Critical Importance of Staying at Home to Prevent Further Spread of Covid-19 (Mar. 15, 2020).

[21]     https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-19.aspx.

19 through and until April 30, 2020.[22] The March 20 and April 1 Closure Orders were again in direct response to the continued and increasing presence of SARS-CoV-2 at property on or around Plaintiffs' premises.

54.     As of as of April 30, 2020, there were nearly 53,000 confirmed cases of COVID-19 in 97 Illinois counties and 2,350 deaths from COVID-19. It is likely that hundreds of thousands (if not millions) more have been infected by SARS-CoV-2 but have not been diagnosed with COVID-19. While in some cases asymptomatic, COVID-19 is also known to cause severe and sometimes fatal respiratory failure. This, in addition to the highly contagious nature of SARS-CoV-2, renders any property exposed to the contagion unsafe and dangerous. By Executive Orders 2020-32 and 2020-33, dated April 30, 2020, Governor Pritzker extended the statewide stay-at-home order through May 29, 2020.[23] The March 15, March 20, April 1 and April 30 Executive Orders are collectively referred to as the "Closure Orders."

55.     The Commissioner of Health of the City of Chicago has likewise issued a series of orders, including Order No. 2020-3 – Amended And Reissued, effective May 1, 2020, applying the Governor's Closure Orders.[24] As of May 11, 2020, the City of Chicago reported 31,477 cases of COVID-19 had been identified in Chicago residents to that date, and 79,007 in the state of Illinois.[25]

---

[22]     https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-18.aspx.

[23]     https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-32.aspx.; https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-33.aspx.

[24]     https://www.chicago.gov/content/dam/city/depts/cdph/HealthProtectionandResponse /CDPH%20Order%202020-3%20- %20Lakefront%20closure%20AMENDED%20AND%20RE-ISSUED.pdf.

[25]     https://www.chicago.gov/city/en/sites/covid-19/home.html.

56.     Further, multiple structures in the vicinity of Plaintiff's covered premises reported COVID-19 infections or outbreaks, and were in fact physically impacted by the presence of the SARS-CoV-2 virus on or around the surfaces of these structures, including a near-by senior living facility.[26]

57.     The Governor of the State of Illinois, the Mayor of Chicago and the Commissioner of Health of the City of Chicago are civil and/or governmental authorities as contemplated by the Policy.

58.     Plaintiff's business remained open and operating throughout the entire period from December 2019 through March 16, 2020.

59.     It was when Illinois State and local governments entered civil authority orders beginning in March 2020 that Plaintiff was forced to close its premises to the public and interrupt its business operations.

### The Cincinnati Policy

60.     To protect its thriving business from interruption and other perils, Plaintiff purchased the Policy from Cincinnati, which includes loss of business income, extra expense, property, liability, and other coverages.

61.     In exchange for substantial premiums, Cincinnati agreed to provide the insurance coverages described in Plaintiff's Policy.

62.     Plaintiff has paid all required premiums and performed all conditions precedent for

---

[26]     Woodbridge Nursing Pavilion, located in the same Logan Square neighborhood as Plaintiff's business, reportedly "has the highest number of COVID-19 cases among all long-term care facilities in Illinois." *See* Families Worry Over Safety of Residents Stuck Inside Nursing Home With 150 COVID-19 Cases, available at https://abc7chicago.com/amp/woodbridge-nursing-pavilion-chicago-coronavirus-home-logan-square/6146020/.

obtaining coverage under the Policy.

63. The Policy includes, in pertinent part, property coverage terms and conditions in Form FM 101 05 16 (BUILDING AND PERSONAL PROPERTY COVERAGE FORM (INCLUDING SPECIAL CAUSES OF LOSS)). The Policy also incorporates an endorsement form titled BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM – ILLINOIS, which adds further coverage for Business Income and Extra Expense coverage, Civil Authority Coverage and Extended Business Income Coverage. (Form FA 213 IL 05 16, at pp. 1-3).

64. The Policy coverage broadly protects Plaintiff against losses suffered by Plaintiff when it was forced to close its doors to the public, including property damage, the loss of "Business Income" and "Extra Expense" incurred due to the necessary "suspension" of Plaintiff's "operations."

65. In many parts of the world, property insurance is sold on a specific peril basis. Such policies cover a risk of loss only if that risk of loss is specifically listed (*e.g.*, hurricane, earthquake H1N1, etc.). Most property policies sold in the United States, however, including those sold by Cincinnati, are all-risk property damage policies. These types of policies cover all risks of loss except for risks that are expressly and specifically excluded.

66. The Plaintiff's Policy is an "all risks" policy. That is, the Policy covers Plaintiff for any peril, imaginable or unimaginable, unless expressly excluded or limited.

67. The Policy contains several exclusions, which preclude coverage for the risks identified in those exclusions.

68. Cincinnati did not exclude or limit coverage for losses from viruses or pandemics, either in the main coverage form or in any endorsement. Likewise, none of the exclusions in the Policy preclude coverage for damage to property caused by the SARS-CoV-2 virus itself, whether

16

at Plaintiff's covered premises or at any other premises.

69.     Nor do any of the exclusions in the Policy preclude coverage for the governmental orders pursuant to which Plaintiff closed its premises to the public and suspended its regular business operations. The governmental orders therefore constitute a covered direct loss under the Policy.

70.     Thus, any losses sustained by Plaintiff because of the damage caused by the SARS-CoV-2 virus itself, or resulting from the action of civil authority prohibiting access to and use of its covered premises in response to the COVID-19 pandemic, are covered by the Policy.

71.     In the Policy, specifically, Cincinnati agreed to pay for direct physical loss or damage to Covered Property unless specifically excluded or limited in the policy. The insuring agreement for Building And Personal Property Coverage provides:

> **SECTION A. COVERAGE**
> We will pay for direct "loss" to Covered Property at the "premises"
> caused by or resulting from any Covered Cause of Loss.

(FM 101 05 16, at p. 3).

72.     The policy defines "loss" as "accidental physical loss or accidental physical damage." (FM 101 05 16, at p. 38).  Covered causes of loss "means direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." (FM 101 05 16, at p. 5).

73.     In addition to property damage losses, Cincinnati agreed in the Policy to pay for its insureds' loss of Business Income caused by and Extra Expense incurred due to a Covered Cause of Loss. Among others, Cincinnati promised to pay for the loss of Business Income and Extra Expense sustained due to the necessary "suspension" of the insured's "operations" during the "period of restoration."

74.     In that regard, the Policy includes Coverage Extensions, including for Business

17

Income and Extra Expense coverage, Civil Authority Coverage and Extended Business Income Coverage. (FM 101 05 16, at pp. 18-21). The Policy specifies that Coinsurance does not apply to these Coverage Extensions.

> **SECTION E. ADDITIONAL CONDITIONS, 1. Coinsurance**, does not apply to these Coverage Extensions.

(FM 101 05 16, at p. 17). The Policy also incorporates an endorsement form titled BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM – ILLINOIS, which adds further coverage for Business Income and Extra Expense coverage, Civil Authority Coverage and Extended Business Income Coverage. (Form FA 213 IL 05 16, at pp. 1-3).

75. Coverage for Business Income and Extra Expense are provided in the property coverage form, with the following coverage grant provisions:

> **(1) Business Income**
> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss. With respect to "loss" to personal property in the open or personal property in a vehicle or portable storage unit, the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever is greater.
>
> \*     \*     \*
>
> **(2) Extra Expense**
> **(a)** We will pay Extra Expense you sustain during the "period of restoration". Extra Expense means necessary expenses you sustain (as described in Paragraphs **(2)(b), (c)** and **(d)**) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.
> **(b)** If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses (other than the expense to repair or replace property as described in Paragraph **2.d**.) to:
> **1)** Avoid or minimize the "suspension" of business and

to continue "operations" either:

    **a)**    At the "premises"; or

    **b)**    At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

    **2)**    Minimize the "suspension" of business if you cannot continue "operations".

**(c)**    We will also pay expenses to:

    **1)**    Repair or replace property; or

    **2)**    Research, replace or restore the lost information on damaged "valuable papers and records";

but only to the extent this payment reduces the otherwise payable "Business Income" loss. If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the amount we will pay under this Coverage Form will be reduced by the salvage value of that property.

**(d)**    Extra Expense does not apply to "loss" to Covered Property as described in the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**.

(FM 101 05 16, at p. 10).

76.    The Illinois Business Income endorsement provides additional, separate Business Income and Extra Expense coverage grants.

**1.**    **Business Income**

    **a.**    We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at "premises" which are described in the Declarations and for which a "Business Income" Limit of Insurance is shown in the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss. With respect to "loss" to personal property in the open (or personal property in a vehicle or portable storage unit), the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever distance is greater.

\*    \*    \*

**2.**    **Extra Expense**

    **a**.    Extra Expense coverage is provided at the "premises"

described in the Declarations only if the Declarations show that "Business Income" coverage applies at that "premises".

**b.** Extra Expense means necessary expenses you sustain (as described in Paragraphs **2.c., d.** and **e.**) during the "period of restoration" that you would not have sustained if there had been no direct 'loss' to property caused by or resulting from a Covered Cause of Loss.

**c.** If these expenses reduce the otherwise payable "Business Income" loss, we will pay expenses (other than the expense to repair or replace property as described in Paragraph **2.d.**) to:

    **(1)** Avoid or minimize the "suspension" of business and to continue "operations" either:

        **(a)** At the "premises"; or

        **(b)** At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

    **(2)** Minimize the "suspension" of business if you cannot continue "operations".

**d.** We will also pay expenses to:

    **(1)** Repair or replace property; or

    **(2)** Research, replace or restore the lost information on damaged "valuable papers and records";

but only to the extent this payment reduces the otherwise payable "Business Income" loss. If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the amount we will pay under this Coverage Form will be reduced by the salvage value of that property.

**e.** Extra Expense as described in Paragraphs **2.a.** thru **2.d.** does not apply to "loss" to Covered Property as described in the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**.

(FA 213 05 16 at pp. 1-2).

77. The Policy defines "business income" as follows:

**2.** "Business Income" means the:

**a.** Net Income (net profit or loss before income taxes) that would have been earned or incurred; and

**b.** Continuing normal operating expenses sustained, including payroll.

(FA 213 05 16, at p. 38). Likewise, "suspension" is defined to mean:

> **a.** The slowdown or cessation of your business activities; and
>
> **b.** That a part or all of the "premises" is rendered untenantable.

(FA 213 05 16, at p. 40).

78.     The presence of virus or disease can constitute physical damage to property, as the insurance industry has recognized since at least 2006. At that time, the insurance industry drafting arm, Insurance Services Office (ISO), and the American Association of Insurance Services (AAIS) represented hundreds of insurers in seeking approval of a new virus exclusion. ISO submitted to state regulators a memo titled "New Endorsements Filed To Address Exclusion of Loss Due to Virus or Bacteria," dated July 6, 2006, that included the following representations:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.[27]

79.     The Policy also includes "Civil Authority" coverage, pursuant to which Cincinnati promised to pay for the loss of Business Income and necessary Extra Expense sustained by Plaintiff that is "caused by action of civil authority that prohibits access" to Plaintiff's insured premises.

80.     Civil Authority Coverage is provided in the property coverage form, with the following grant provisions:

> **(3)     Civil Authority**
> When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual

---

[27]     *See*   https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

**(a)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

**(b)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

This Civil Authority coverage for "Business Income" will begin immediately after the time of that action and will apply for a period of up to 30 days from the date of that action.

This Civil Authority coverage for Extra Expense will begin immediately after the time of that action and will end:

**1)** 30 consecutive days after the time of that action; or

**2)** When your "Business Income" coverage ends;

whichever is later.

(FM 101 05 16, at p. 19).

81. Further, the Illinois Business Income endorsement provides additional, separate Civil Authority coverage.

**b. Civil Authority**

When a Covered Cause of Loss causes direct damage to property other than Covered Property at the "premises", we will pay for the actual loss of "Business Income" you sustain and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for "Business Income" will begin immediately after the time of the first action of civil authority that

22

prohibits access to the "premises" and will apply for a period of up to 30 consecutive days from the date on which such coverage began.

Civil Authority coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the "premises" and will end 30 consecutive days after the date of that action; or when your Civil Authority coverage for "Business income" coverage ends, whichever is later.

(FA 213 05 16 at 2).

82. This Civil Authority coverage is triggered when any non-excluded cause results in "damage to property other than property" at the Plaintiff's premises, and is intended to cover losses resulting from governmental actions "taken in response to dangerous physical conditions."

83. This Civil Authority provision is an independent basis for business interruption coverage. That is, it can be triggered even when the standard business interruption coverage is not.

84. Parts of the Policy, including the "Business Income (and Extra Expense) Coverage Form," are standardized forms drafted by ISO.

85. In 2006, ISO drafted a new endorsement, CP 01 40 07 06, acknowledging that claims for business interruption losses would be filed under existing policy language for losses resulting from the presence of disease-causing agents. Endorsement CP 01 40 07 06, which other insurers have since incorporated in policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Significantly, Cincinnati did not include this endorsement in Plaintiff's Policy.

86. Plaintiff's Policy does not contain any exclusion which would apply to allow Cincinnati to deny coverage for losses caused by SARS-CoV-2 and related actions of civil authorities taken in response to SARS-CoV-2.

87. Accordingly, because the Policy is an all-risk policy and does not specifically

exclude the losses that Plaintiff has suffered, those losses are covered.

88.     Additionally, under the Policy, Cincinnati also promised to cover "Extended Business Income." This coverage requires Cincinnati to pay for loss of business income *beyond* the Period of Restoration under certain conditions.

89.     Coverage for Extended Business Income Coverage is provided in the property coverage form, with the following grant provisions:

> **(6)     Extended Business Income**
> **(a)**     For "Business Income" Other Than "Rental Value", if the necessary "suspension" of your "operations" produces a "Business Income" or Extra Expense "loss" payable under this Coverage Part, we will pay for the actual loss of "Business Income" you sustain and Extra Expense you incur during the period that:
> **1)**     Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and
> **2)**     Ends on the earlier of:
>> **a)**     The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have  existed if no direct "loss" had occurred; or
>> **b)**     60 consecutive days after the date determined in **b.(6)(a)1)** above.
>
> However, Extended Business Income does not apply to loss of "Business Income" sustained or Extra Expense incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the "premises" are located.
>
> Loss of "Business Income" must be caused by direct "loss" at the "premises" caused by or resulting from any Covered Cause of Loss.
>
> *          *          *

(FM 101 05 16, at p. 29).

90.     Further, the Illinois Business Income endorsement provides additional, separate

Civil Authority coverage.

    **c.**    **Extended Business Income**

        **(1)**    "Business Income" Other Than **"Rental Value"**

            If the necessary "suspension" of your "operations" produces a "Business Income" loss payable under this Coverage Part, we will pay for the actual loss of "Business Income" you sustain during the period that:

            **(a)**    Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and

            **(b)**    Ends on the earlier of:

                **(i)**    The date you could restore your "operations", with reasonable speed, to the level which would generate the "Business Income" amount that would have existed if no direct "loss" had occurred; or

                **(ii)**    60 consecutive days after the date determined in **c.(1)(a)** above.

            However, Extended Business Income does not apply to loss of "Business Income" sustained as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the "premises" are located.

            Loss of "Business Income" must be caused by direct "loss" at the "premises" caused by or resulting from any Covered Cause of Loss.

                      \*       \*       \*

(FA 213 05 16 at 3).

## The Property Damage Loss

91.    The scientific community and those personally and professionally affected by the virus recognize SARS-CoV-2 as a cause of real physical loss and damage. Recently, the Pennsylvania Supreme Court likewise found that the COVID-19 pandemic constitutes a "natural disaster," namely because, like other identified natural disasters, it involves "substantial damage to property, hardship, suffering or possible loss of life." *Friends of Danny DeVito, et al. v. Tom Wolf, Governor, et al.*, No. 68 MM 2020, 21 n.11, 2020 WL 1847100, at \*10 n.11 (Pa. Apr. 13,

2020). The Pennsylvania Supreme Court found that any affected business location is within such a "disaster area" and has sustained property damage because COVID-19 is "spread by person-to-person contact, . . . has an incubation period of up to fourteen days, . . . can live on surfaces for up to four days and can remain in the air within confined areas and structures." *Id.* 68 MM 2020, at 29; 2020 WL 1847100, at *13. Thus, the Court rejected an argument that COVID-19 must be detected at a specific location for that location to fall within the scope of the disaster area. *Id.*

92. At the time each of the Closure Orders were issued, civil authorities had confirmed that properties and premises throughout the State of Illinois contained SARS-CoV-2 particles on surfaces and items of property.

93. Other governmental authorities and public health officials around the country have similarly acknowledged that the spread of SARS-CoV-2 causes direct physical loss and damage to property. For example:

a. The State of Colorado issued a public health order indicating that "COVID-19 … **physically contributes to property loss, contamination, and damage**…" (Emphasis added);

b. The City of New York issued an emergency executive order in response to COVID-19 and the pandemic, in part "because **the virus physically is causing property loss and damage."** (Emphasis added);

c. Broward County, Florida issued an emergency order acknowledging that COVID-19 "**is physically causing property damage**." (Emphasis added);

d. The State of Washington issued a stay at home proclamation stating the "COVID-19 pandemic and its progression … remains a public disaster affecting life, health, [and] **property**…" (Emphasis added);

e. The State of Indiana issued an executive order recognizing that COVID-19 has the "propensity to **physically impact surfaces and personal property**." (Emphasis added);

f. The City of New Orleans issued an order stating "there is reason to believe that COVID-19 may spread amongst the population by various means of exposure, including the propensity to attach to surfaces for prolonged period

26

of time, thereby spreading from surface to person and **causing property loss and damage** in certain circumstances." (Emphasis added);

g. The State of New Mexico issued a public health order acknowledging the "threat" COVID-19 "poses" to "**property**." (Emphasis added);

h. North Carolina issued a statewide executive order in response to the COVID-19 pandemic not only "to assure adequate protection for lives," but also to "assure adequate protection of… **property**." (Emphasis added); and

i. The City of Los Angeles issued an order in response to COVID-19 "because, among other reasons, the COVID-19 virus can spread easily from person to person and it is **physically causing property loss or damage** due to its tendency to attach to surfaces for prolonged periods of time." (Emphasis added).

j. Napa County, California issued an order in response to the COVID-19 pandemic "based on evidence of increasing occurrence of COVID-19 throughout the Bay Area, increasing the likelihood of occurrence of COVID-19 within the County, **and the physical damage to property caused by the virus**." (Emphasis added).

94. As these orders all recognize, the presence of people infected with or carrying SARS-CoV-2 particles throughout the state in places like Plaintiff's insured premises, where public gatherers typically socialize, eat, drink, or use for entertaining or other recreation renders those places unsafe and unusable. The Orders of the civil authorities, including the Closure Orders, were issued in direct response to these existing dangerous physical conditions.

95. The continuous presence of SARS-CoV-2 on and around Plaintiff's premises has rendered the premises uninhabitable, unsafe and unfit for their intended use and therefore caused covered, direct physical damage and/or direct physical loss under Plaintiff's policy, and the policies of the other Class members, by denying use of and damaging the covered property, and causing a necessary suspension of operations during a period of restoration.

96. Executive Order 2020-07 was issued in direct response to the dangerous physical conditions caused by the presence of SARS-CoV-2, and prohibited the public from accessing

27

Plaintiff's tavern, thereby causing the necessary suspension of its operations and triggering the Civil Authority coverage under the Policy. Executive Order 2020-07 specifically states, "the Illinois Department of Public Health recommends Illinois residents avoid group dining in public settings, such as in bars and restaurants, which usually involves prolonged close social contact contrary to recommended practice for social distancing," and that "frequently used surfaces in public settings, including bars and restaurants, if not cleaned and disinfected frequently and properly, also pose a risk of exposure."

97.     Governor Pritzker's March 20, 2020 Closure Order (Executive Order 2020-10) closing all "non-essential" businesses in Illinois, including all restaurants and bars, likewise was made in direct response to the continued and increasing presence of the coronavirus on property or around Plaintiff's premises.

98.     Like the March 15, 2020 Closure Order, the March 20, April 1 and April 30 Closure Orders prohibited the public from accessing Plaintiff's tavern, thereby causing the necessary suspension of its operations.

99.     The Closure Orders prohibiting public access to the covered premises and the surrounding area were issued in response to dangerous physical conditions and caused a suspension of business operations on the covered premises.

100.    The presence of SARS-CoV-2 caused direct physical loss of and/or damage to the covered premises under the Policy by, among other things, damaging the property, denying access to the property, preventing customers from physically occupying the property, causing the property to be physically uninhabitable by customers, causing its function to be nearly eliminated or destroyed, and/or causing a suspension of business operations on the premises.

101.    As a result of the Closure Orders, the Plaintiff has suffered substantial losses and

28

incurred significant expense. As a result of the Closure Orders, issued in response to the COVID-19 pandemic, Plaintiff and the other Class members lost Business Income and incurred Extra Expense.

102.    As a result of the presence of SARS-CoV-2, and the COVID-19 pandemic, Plaintiff and the other Class members lost Business Income and incurred Extra Expense.

103.    The covered Business Income losses and Extra Expenses incurred by Plaintiff and owed under the Policy continues to increase. As a result of these catastrophic losses, Plaintiff has been forced to furlough workers and ultimately may have to close its operation permanently.

104.    The Closure Orders prohibited the public from accessing Plaintiff's insured premises described in the Policy, thereby causing the necessary suspension of operations and triggering the Business Income, Extra Expense, and Civil Authority coverages under the Policy. Moreover, the presence of SARS-CoV-2 on or around Plaintiff's premises damaged property by infecting it and rendered the premises unsafe, uninhabitable, and unfit for their intended use.

105.    Upon information and belief, people carrying SARS-CoV-2 particles in, on, or about their person, were physically present at or around Plaintiff's insured premises during the time the Policy was in effect.

106.    Upon information and belief, SARS-CoV-2 particles have been physically present at or around Plaintiff's insured premises—both airborne and on surfaces and items of property at or around Plaintiff's premises—during the time the Policy was in effect and remained physically present for up to 28 days.

107.    Plaintiff has sustained direct physical loss and damage to items of property located at its premises and direct physical loss and damage to the premises described in the Policy as a result of the presence of SARS-CoV-2 particles and/or the COVID-19 pandemic.

108.    The presence of SARS-CoV-2 caused direct physical loss of and/or damage to the premises insured under the Policy by, among other things, damaging the property, denying access to the property, preventing customers from physically occupying the property, causing the property to be physically uninhabitable by customers, causing its function to be nearly eliminated or destroyed, and/or causing a suspension of business operations on the premises.

**Governmental Action Resulted In A Non-Excluded Loss**

109.    As reflected in the promulgation by ISO of the virus exclusion in 2006, and related statements by the industry when seeking regulatory approval, insurance industry has thus recognized since 2006 that the presence of virus can constitute damage to property.

110.    SARS-CoV-2, a non-excluded Covered Cause of Loss-has been found present on or within property other than covered premises, damaging those properties.

111.    The Policy does not define the term "damage." According to the Oxford English Dictionary, in common usage "damage" means "[p]hysical harm caused to something in such a way as to impair its value, usefulness, or normal function."[28] Black's Law Dictionary supplies a related definition: "(1) Loss or injury to person or property; esp., physical harm that is done to something or to part of someone's body. (2) By extension, any bad effect on something."[29]

112.    SARS-CoV-2 alters the physical landscape of the surfaces on which it is present, rendering those surfaces impure and consequently impairing their value and usefulness. While SARS-CoV-2 may be smaller and less visible than rust, mold, or paint, the virus has mass and is necessarily physical in nature, traveling to other objects and causing harm.

113.    Moreover, access to the area surrounding that damaged property has been

---

[28]    "Damage."        Lexico.com,        Oxford        English        Dictionary,
https://www.lexico.com/en/definition/damage.

[29]    "Damage," Black's Law Dictionary (11th ed. 2019).

prohibited by civil authority as a result of the damage from SARS-CoV-2, as described herein.

114.    The Civil Authority provisions further require that the governmental actions are "taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage."

115.    The Policy does not to define the term "dangerous physical conditions." According to Merriam-Webster dictionary, "Dangerous" means "(1) involving possible injury, pain, harm, or loss ... (2) able or likely to inflict injury or harm."[30]

116.    The presence of SARS-CoV-2 results in conditions that are both dangerous and physical. And by their own terms, the governmental orders described herein were entered in response to these dangerous physical conditions resulting from the damage or continuation of SARS-CoV-2 that caused the damage at properties other than Plaintiff's properties.

117.    One risk addressed, in part, in the exclusions is governmental action. *See* Policy Form FM 101 05 16, Section A, ¶ 3.b.1.c.

118.    By recognizing governmental action in the exclusions, the Policy confirms governmental action as a risk of direct loss and a Covered Cause of Loss.

119.    The Policy excludes some but not all governmental action from coverage. Specifically, the Policy only excludes coverage for loss caused directly or indirectly by governmental action that consists of seizure or destruction of property by order of governmental authority unless the destruction was done to prevent the spread of a fire. As ordinarily used, "seizure" means "taking possession of person or property by legal process."

120.    The governmental Closure Orders affecting Plaintiff's property do not require

---

[30]    "Dangerous."        Merriam-Webster.com        Dictionary,        Merriam-Webster,
https://www.meriamwebster.com/dictionary/dangerous.

seizure or destruction because the government did not destroy or take physical possession of, or title to, such property. Instead, the Closure Orders limited access to and use of covered property at the premises described in the Policy's declarations.

121.    Therefore, the Policy does not exclude the governmental actions described herein.

122.    The business-income losses, extra expenses, and other losses were caused by or resulted from the aforementioned governmental orders, a Covered Cause of Loss.

123.    The Policy further requires that the business-income losses be incurred because of the necessary suspension of operations during the period of restoration. Plaintiff suffered losses because of suspension of operations during the period of restoration.

124.    The direct loss of physical access to and use of the premises listed in the declarations, and business property thereon, for Plaintiff and their vendors, agents, employees, and customers, caused the suspension of the Plaintiff's operations.

125.    Such direct losses are also accidental. Accidental means "occurring unexpectedly or by chance."[31] The Governmental Closure Orders were issued through no fault of Plaintiff and were in no way expected by Plaintiff or other insureds entering into insurance policies with Cincinnati prior to the COVID-19 pandemic.

126.    Because the Policy covers all risks, including governmental action that, for the good of the public, does no more than limit physical access to and use of property (real and personal), coverage is required.

**Cincinnati Did Not Include A Virus Or Pandemic Exclusion In the Policy**

127.    Nothing in the Policy excludes or limits coverage for viruses or virus-related causes

---

[31]    "Accidental."    Merriam-Webster.com    Dictionary,    Merriam-Webster, https://www.merriamwebster.com/dictionary/accidental.

of loss.

128.     As the Policy makes clear, Cincinnati, as the drafter of the Policy, relied on materials generated by ISO in drafting Plaintiff's Policy. ISO is an entity that drafts standard policy language for industry use in insurance contracts.

129.     ISO and insurance providers like Cincinnati became aware of the possibility of virus-related causes during multiple prior health-related crises, including: the 2002 SARS epidemic, 2009 H1N1 swine flu pandemic, 2012 MERS epidemic, 2014 Ebola epidemic, and the 2016 Zika epidemic, among others.

130.     In 2006, after the SARS epidemic, ISO drafted a new endorsement, CP O 1 40 07 06, entitled "Exclusion of Loss Due to Virus or Bacteria," acknowledging that claims for business interruption losses could be filed under existing policy language for losses resulting from pandemics or the presence of disease-causing agents. This new endorsement, which other insurance providers have since incorporated in policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

131.     Despite the widespread recognition of virus-related causes, and the ISO's publication of a new endorsement memorializing an express virus exclusion, Cincinnati did not include a virus exclusion in Plaintiff's Policy. Under Plaintiff's "all risks" Policy, therefore, constitutes a Covered Cause of Loss.

132.     Likewise, Plaintiff's Policy does not exclude from the commercial property coverage losses arising from governmental orders restricting access to Plaintiff's premises and Plaintiff's business operations due to viruses, viral-related causes or pandemics.

133.     No other applicable exclusions or limitations apply to preclude coverage for the

direct losses caused by or resulting from the governmental actions described herein.

**Cincinnati Has Not Paid, And Has No**
**Intention Of Paying, Plaintiff's Claims For Coverage**

134.    On information and belief, Cincinnati has, on a uniform and widescale basis, refused to pay, under its Business Income and Extra Expense coverages and Civil Authority coverages, for losses sustained due to the presence of SARS-CoV-2 and/or related to action of civil authority in response to the COVID-19 pandemic.

135.    While representing to its insureds that it will diligently investigate business interruption claims connected to the COVID-19 pandemic, Cincinnati has told investors the truth: it has no intention to honor, and it will not honor any such claims.

136.    Specifically, in its 10-Q filing for the first quarter of 2020, Cincinnati stated:

> Virtually all of our commercial property policies do not provide coverage for business interruption claims unless there is direct physical damage or loss to property. Because a virus does not produce direct physical damage or loss to property, no coverage exists for this peril - rendering an exclusion unnecessary. For this reason, most of our standard market commercial property policies in states where we actively write business do not contain a specific exclusion for COVID-19. While we will evaluate each claim based on the specific facts and circumstances involved, our commercial property policies do not provide coverage for business interruption claims unless there is direct physical damage or loss to property. [32]

137.    On or about March 20, 2020, Plaintiff timely submitted a claim to Cincinnati for its covered loss.

138.    Contrary to the plain language of the Policy, and to Cincinnati's corresponding promises and contractual obligations, Cincinnati refused to pay for Plaintiff's covered losses and expenses.

---

[32]    Form 10-Q, Cincinnati Financial Corporation (filed Apr. 27, 2020), available at https://cincinnatifinancialcorporation.gcs-web.com/static-files/787fd5db-ee48-474b-98bl-4d7186fa8fb5.

139.    On or about April 15, 2020, without conducting any meaningful investigation or significant follow up inquiry concerning Plaintiff's claim, or related loss, Cincinnati issued a letter denying Plaintiff's claim. (*See* Exhibit B).

140.    As the 10-Q and letter make clear, Cincinnati's premeditated strategy is to deny all claims related to SARS-CoV-2 and the COVID-19 pandemic.

141.    Given Cincinnati's intention to issue categorical denials of all claims related to SARS-CoV-2 and the COVID-19 pandemic, it is no surprise that Cincinnati failed to evaluate Plaintiff's claims based on all information that could be gathered from a fair and neutral individualized investigation. Cincinnati further failed to review ample publicly available and easily-accessible information regarding the claims, and failed to secure an outside counsel opinion on coverage to avoid bias. Cincinnati has made no indication that it has visited or plans to visit any of the covered locations.

142.    Cincinnati's letter further misstates policy terms and engineers new post-hoc requirements for coverage (including, for example, requiring "direct physical loss or direct physical damage ... to property at the covered premises," rather than the requirement as stated in the Policy that "direct 'loss" cause the *suspension*). Cincinnati's letters also quote at length numerous provisions from the Policy themselves, but with no meaningful explanation or analysis.

143.    Plaintiff, on the other hand, satisfied all duties under the Policy and the law.

144.    Cincinnati's repudiation of the insurance contracts that Plaintiff purchased to protect its business and employees is unlawful. The governmental actions affecting Plaintiff's property have caused a loss of income and an increase in expense. This risk of governmental action is nowhere limited or excluded in the Policy.

## CLASS ACTION ALLEGATIONS

145.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

146.     The class claims all derive directly from a single course of conduct by Cincinnati: its systematic and uniform refusal to pay insureds for losses suffered due to the COVID-19 pandemic and the related actions taken by civil authorities to suspend business operations

147.     Plaintiff seeks to represent a Class defined as:

All persons and entities that: (a) had Business Income coverage, Extra Expense coverage, or Civil Authority Coverage, under a property insurance policy issued by Cincinnati; (b) suffered a suspension of business related to the presence or threat of SARS-CoV-2, and/or actions of any civil authority in response to the COVID-19 pandemic, at the premises covered by their Cincinnati property insurance policy; (c) made a claim under their policy issued by Cincinnati for loss of business income and/or expenses to minimize the suspension of business due to COVID-19 and/or actions of any civil authority in response to COVID-19; and (d) as to which Cincinnati denied or has otherwise failed to acknowledge, accept as covered losses or expenses, or pay for the covered losses or expenses.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and the members of their family; (2) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

148.     This action can be maintained as a class action because there is a well-defined

community of interest in the litigation and the proposed Class is easily ascertainable.

149. **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable. The exact number of members of the Class is unknown, but the Class likely consists of thousands of members. Members of the Class can be easily identified through Defendant's records.

150. **Commonality and Predominance**: This action involves common questions of law and fact applicable to each class member that predominate over questions that affect only individual class members. Thus, proof of a common set of facts will establish the right of each class member to recover. Questions of law and fact common to the claims of the Plaintiff and members of the putative Class, which predominate over any individual issues, include, among others:

a. Whether Cincinnati issued all-risk insurance policies to Plaintiff and members of the Class in exchange for payment of premiums by Plaintiff and the Class members;

b. Whether Plaintiffs and the Class suffered a covered loss based on the common policies issued to Plaintiff and members of the Class;

c. Whether SARS-CoV-2 causes direct physical loss or damage to property;

d. Whether Cincinnati's Business Income and Extra Expense coverage applies to a suspension of business related to SARS-CoV-2 and the COVID-19 pandemic;

e. Whether the Closure Orders constitute "action[s] of civil authority";

f. Whether Cincinnati's Civil Authority coverage applies to a loss of Business Income caused by the actions of any civil authority requiring the suspension

of business related to SARS-CoV-2 and the COVID-19 pandemic;

g.    Whether Cincinnati's Extra Expense coverage applies to efforts to minimize a loss caused by SARS-CoV-2 and the COVID-19 pandemic and/or the actions of any civil authority requiring the suspension of business related to SARS-CoV-2 and the COVID-19 pandemic;

h.    Whether Cincinnati's wrongfully denied all claims based on loss caused by SARS-CoV-2 and the COVID-19 pandemic;

i.    Whether Cincinnati's wrongfully denied all claims based on loss caused by the actions of any civil authority requiring the suspension of business related to SARS-CoV-2 and the COVID-19 pandemic;

j.    Whether Cincinnati has breached its contracts of insurance through a blanket denial of all claims based on business interruption, income loss or closures related to SARS-CoV-2, the COVID-19 pandemic and/or the related actions of any civil authority requiring the suspension of business related to SARS-CoV-2 and the COVID-19 pandemic;

k.    Whether Cincinnati has breached its covenant of good faith and fair dealing through a blanket denial of all claims based on business interruption, income loss or closures related to SARS-CoV-2, the COVID-19 pandemic and/or the related actions of any civil authority requiring the suspension of business related to SARS-CoV-2 and the COVID-19 pandemic; and

l.    Whether Plaintiff and the Class are entitled to an award of reasonable attorney fees, interest and costs.

151.    **Typicality**:  Plaintiff's claims are typical of the claims of the proposed Class.  All

claims are based on the same principal legal and factual issues in that Plaintiff and members of the Class purchased identical insurance coverage from Cincinnati containing identical language regarding business income losses and extra expense, their coverage claims for losses caused by SARS-CoV-2, the COVID-19 pandemic and the resulting Closure Orders were denied by Cincinnati, and they have sustained damages arising out of Cincinnati's wrongful denials.

152.    **Adequacy of Representation**:  Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex class actions and insurance coverage matters. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class members. Cincinnati has no defenses unique to Plaintiff. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so.

153.    **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests:** Plaintiff seeks class-wide adjudication as to the interpretation, and resultant scope, of the Cincinnati coverage. The prosecution of separate actions by individual members of the Class would create an immediate risk of inconsistent or varying adjudications on this issue, which would establish incompatible standards of conduct for Cincinnati in evaluating future claims. Moreover, the adjudications sought by Plaintiff could, as a practical matter, substantially impair or impede the ability of other Class members, who are not parties to this action, to protect their interests. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication. A class action can, therefore, best secure the economies of time, effort, and expense or accomplish the other ends of equity and justice that this action seeks to obtain.

154. **Declaratory and Injunctive Relief:** Cincinnati acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class.

155. **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

156. Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I
### (Declaratory Judgment)

157. Plaintiff adopts and incorporates by reference paragraphs 1-156 of this Complaint as if fully set forth herein.

158. Plaintiff's Policy, as well as those of other members of the Class, are insurance contracts for which Cincinnati was paid premiums in exchange for its promise to pay Plaintiff's and the Class' losses for claims covered by the Policy.

159. Plaintiff and other members of the Class have complied with all applicable terms, conditions and provisions of the Policy and/or those terms, conditions and provisions have been

waived by Cincinnati, or Cincinnati is estopped from asserting them.

160.    Coverage under the Policy is provided for any risk of direct loss unless expressly limited or excluded.

161.    Cincinnati agreed to pay for its insureds' actual loss of Business Income sustained and Extra Expense incurred by Plaintiff due to the necessary suspension of operations during a "period of restoration."

162.    Cincinnati also promised to pay for the loss of Business Income and necessary Extra Expense sustained by Plaintiff that is "caused by action of civil authority that prohibits access" to Plaintiff's insured premises.

163.    SARS-CoV-2 caused direct physical loss and damage to Plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Loss of access to and/or loss of ability to use  property also constitutes direct physical loss or damage, triggering coverage. Losses caused by SARS-CoV-2, and the COVID-19 pandemic, thus triggered the Business Income and Extra Expense provisions of Plaintiff's and the other Class members' insurance policies.

164.    The Executive Orders by state and local civil authorities were issued in direct response to the COVID-19 outbreak and the physical presence of SARS-CoV-2 on property on or around covered premises, forcing closure of premises to the public and curtailment of business operations.

165.    Cincinnati did not include an exclusion for loss caused by a virus or a pandemic in the Policy. Nor do any of the exclusions in the Policy preclude coverage for the governmental orders restricting access to Plaintiff's premises and Plaintiff's business operations due to viruses, viral-related causes or pandemics, pursuant to which Plaintiff closed its premises to the public and

suspended its regular business operations.

166.    Due to the presence of SARS-CoV-2, and the COVID-19 pandemic, Plaintiff and the other members of the Class suffered a loss of Business Income and have incurred Extra Expense.

167.    Cincinnati has arbitrarily and without justification refused to reimburse Plaintiff and members of the Class for any losses incurred by them related to the necessary interruption of their businesses stemming from SARS-CoV-2, the COVID-19 pandemic and the related Closure Orders.

168.    Cincinnati has denied claims stemming from SARS-CoV-2, the COVID-19 pandemic and the related Closure Orders on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment.

169.    An actual case or controversy exists regarding Plaintiff's and the Class' rights and Cincinnati's obligations under the Policy to reimburse Plaintiff and the Classes for the full amount of losses and extra expenses incurred by Plaintiff and the Class in connection with the suspension of their businesses stemming from SARS-CoV-2, the COVID-19 pandemic and the related Closure Orders.

170.    Pursuant to 28 U.S.C. § 2201, Plaintiff and the Class seek a declaratory adjudging and judgment from this Court declaring the following:

a.     Plaintiff's and the Class' losses incurred in connection with the necessary suspension of their businesses stemming from SARS-CoV-2, the COVID-19 pandemic and the related Closure Orders are insured losses under the policies;

b.     Cincinnati has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for Plaintiff's and the Class' losses by

issuing blanket coverage denials without conducting claim investigations as required under Illinois law; and

c.     Cincinnati is obligated to pay Plaintiff and the Class for the full amount of the losses and extra expenses incurred and to be incurred in connection with the covered business losses related to the Closure Orders during period of restoration and the necessary with the necessary suspension of their businesses stemming from SARS-CoV-2, the COVID-19 pandemic and the related Closure Orders.

## COUNT II
### (Breach of Contract)

171.    Plaintiff adopts and incorporates by reference paragraphs 1-156 of this Complaint as if fully set forth herein.

172.    Plaintiff's Policy, as well as those of other members of the Class, are insurance contracts for which Cincinnati was paid premiums in exchange for its promise to pay Plaintiff's and the Class' losses for claims covered by the Policy.

173.    Plaintiff and other members of the Class have complied with all applicable terms, conditions and provisions of the Policy and/or those terms, conditions and provisions have been waived by Cincinnati, or Cincinnati is estopped from asserting them.

174.    Coverage under the Policy is provided for any risk of direct loss unless expressly limited or excluded.

175.    Cincinnati agreed to pay for its insureds' actual loss of Business Income sustained and Extra Expense incurred by Plaintiff due to the necessary suspension of operations during a "period of restoration."

176.    Cincinnati also promised to pay for the loss of Business Income and necessary Extra Expense sustained by Plaintiff that is "caused by action of civil authority that prohibits access" to

Plaintiff's insured premises.

177.     SARS-CoV-2 caused direct physical loss and damage to Plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Loss of access to and/or loss of ability to use  property also constitutes direct physical loss or damage, triggering coverage. Losses caused by SARS-CoV-2, and the COVID-19 pandemic, thus triggered the Business Income and Extra Expense provisions of Plaintiff's and the other Class members' insurance policies.

178.     The Executive Orders by state and local civil authorities were issued in direct response to the COVID-19 outbreak and the physical presence of SARS-CoV-2 on property on or around covered premises, forcing closure of premises to the public and curtailment of business operations.

179.     Cincinnati did not include an exclusion for loss caused by a virus or a pandemic in the Policy. Nor do any of the exclusions in the Policy preclude coverage for the governmental orders restricting access to Plaintiff's premises and Plaintiff's business operations due to viruses, viral-related causes or pandemics, pursuant to which Plaintiff closed its premises to the public and suspended its regular business operations.

180.     Due to the presence of SARS-CoV-2, and the COVID-19 pandemic, Plaintiff and the other members of the Class suffered a loss of Business Income and have incurred Extra Expense.

181.     By denying coverage for Business Income and Extra Expense losses incurred by Plaintiff and members of the Class, related to SARS-CoV-2, the COVID-19 pandemic and the related Closure Orders, Cincinnati has repudiated its contract and breached its coverage obligations

under its Policy.

182.     As a result of Cincinnati's breaches of its policies, Plaintiff and the other Class members have sustained substantial damages for which Cincinnati is liable, in an amount to be established at trial.

## COUNT III
### (Breach of the Duty of Good Faith and Fair Dealing)

183.     Plaintiff adopts and incorporates by reference paragraphs 1-182 of this Complaint as if fully set forth herein.

184.     Good faith is an element of the contract that Plaintiff and the Class entered into with Defendant in obtaining insurance coverage. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to Their terms, means preserving the spirit—not merely the letter—of the bargain.

185.     Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

186.     Plaintiff and the Class performed all their obligations under their contracts with Cincinnati.

187.     Cincinnati breached the covenant of good faith and fair dealing by purposefully mischaracterizing provisions of its insurance coverage agreements so as to not honor its contractual duties to Plaintiff and the Class under those agreements.

188.     Plaintiff and the Class have sustained damages as a result of Defendant's breaches of the covenant of good faith and fair dealing in an amount to be proven at trial.

## COUNT IV
### (Statutory Bad Faith Denial of Insurance Under 215 ILCS 5/155)

189.    Plaintiff adopts and incorporates by reference paragraphs 1-188 of this Complaint as if fully set forth herein.

190.    Upon receipt of the claims by Plaintiff and other members of the Class related to SARS-CoV-2, the COVID-19 pandemic and the related Closure Orders, Cincinnati denied the claims without conducting any investigation, let alone a "reasonable investigation based on all available information" as required under Illinois law. *See* 215 ILCS 5/154.6.

191.    Cincinnati's denials of claims by Plaintiff and other members of the Class related to SARS-CoV-2, the COVID-19 pandemic and the related Closure Orders were vexatious and unreasonable.

192.    Cincinnati's denials constitute "improper claims practices" under Illinois law— namely Cincinnati's (1) refusals to pay Plaintiff's and the Class members' claims without conducting reasonable investigations based on all available information and (2) failure to provide reasonable and accurate explanations of the bases in its denials. *See* 215 ILCS 5/154.6 (h), (n).

193.    Therefore, pursuant to 215 ILCS 5/155, Plaintiff requests that, in addition to entering a judgment in favor of Plaintiff and the Class and against Cincinnati for the amount owed under the policies at the time of judgment, the Court also enter a judgment in favor of Plaintiff and the Class against Cincinnati for an amount equal to the greater of (1) 60% of the amount which the trier of fact finds that Plaintiff and the Class are entitled to recover under the policies, exclusive of costs; and (2) $60,000 per Class member. See 215 ILCS 5/155.

194.    Plaintiff further requests that the Court enter a judgment in favor of Plaintiff and the Class, and against Cincinnati in an amount equal to the attorneys' fees and costs incurred by Plaintiff for the prosecution of this coverage action against Cincinnati, which amount will be

proved at or after trial, pursuant to 215 ILCS 5/155.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Class, respectfully requests that the Court enter an Order as follows:

A.  Finding that this action satisfies the prerequisites for maintenance as a class action, and certifying the Class defined herein.

B.  Designating Plaintiff as representative of the Class, and its undersigned counsel as Class Counsel.

C.  Entering declaratory judgment in favor of Plaintiff and the Class, and against Cincinnati, on Count I, and declaring as follows:

1.  Plaintiff's and the Class' losses incurred in connection with the necessary suspension of their businesses stemming from SARS-CoV-2, the COVID-19 pandemic and the related Closure Orders are insured losses;

2.  Cincinnati has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for Plaintiff's and the Class' losses by issuing blanket coverage denials without conducting claim investigations as required under Illinois law; and

3.  Cincinnati is obligated to pay Plaintiff and the Class for the full amount of the losses and extra expenses incurred and to be incurred in connection with the covered business losses related to the necessary suspension of their businesses stemming from SARS-CoV-2, the COVID-19 pandemic and the related Closure Orders.

D.  Entering judgment in favor of Plaintiff and the Class, and against Cincinnati, on

47

Count II, finding Cincinnati breached its contracts of insurance, and awarding damages for that breach of contract in an amount to be established at trial.

E.  Entering judgment in favor of Plaintiff and the Class, and against Cincinnati, on Count III, finding Cincinnati breached the covenant of good faith and fair dealing in its contracts of insurance, and awarding damages for that breach in an amount to be established at trial.

F.  Entering judgment in favor of Plaintiff and the Class, and against Cincinnati, on Count IV, finding Cincinnati acted in bad faith, and awarding damages in the amount equal to the greater of (1) 60% of the amount which the trier of fact finds that Plaintiff and the Class are entitled to recover under the policies, exclusive of costs; and (2) $60,000 per Class member.

G.  Entering judgment in favor of Plaintiff and the Class, and against Cincinnati, in an amount equal to all attorney fees and related costs, to be established at the conclusion of this action, incurred for the prosecution of this coverage action against Cincinnati, pursuant to 215 ILCS 5/155.

H.  Awarding to Plaintiff and the Class pre- and post- judgment interest, to the fullest extent allowable.

I.  Awarding to Plaintiff and the Class any such further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all issues so triable.

48

Respectfully submitted,

T&E CHICAGO LLC, individually, and on behalf of all others similarly situated,

By:    /s/ Jeffrey A. Berman
          One of its Attorneys

Jeffrey A. Berman
Ryan M. Kelly
Patrick J. Solberg
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: 847/368-1500
Fax: 847/368-1501

Counsel for the Plaintiff and the Class