# EXHIBIT F

**UNITED STATES OF AMERICA**

**STATE OF ILLINOIS**                                                    **COUNTY OF DU PAGE**

**IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**

ITS NICE INC

-VS-

STATE FARM FIRE AND CASUALTY CO

2020L000547
**CASE NUMBER**

# FILED

**20 Sep 29   PM 01: 07**

*Chris Kachiroubas*

**CLERK OF THE**
**18TH JUDICIAL CIRCUIT**
**DUPAGE COUNTY, ILLINOIS**

**ORDER**

For the reasons stated on the record, Defendant State Farm's 2-615 motion to dismiss is granted, with prejudice, with respect to both Count I and Count II of Plaintiff's complaint.

Submitted by: JUDGE BRYAN CHAPMAN

DuPage Attorney Number:

Attorney for:

Address:

City/State/Zip:

Phone number:

Entered: File Date: 09/29/2020

JUDGE BRYAN CHAPMAN

Validation ID : DP-09292020-0107-11175

Date: 09/29/2020

IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT
DU PAGE COUNTY, ILLINOIS

| | |
|---|---|
| IT'S NICE, INC., d/b/a ) | |
| HAROLD'S CHICKEN SHACK #83, an ) | |
| Illinois Corporation, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | No. 20 L 547 |
| ) | 2-615 Motion |
| STATE FARM FIRE AND CASUALTY ) | |
| CO., ) | |
| ) | |
| Defendant. ) | |

REPORT OF VIDEOCONFERENCE PROCEEDINGS

had at the hearing of the above-entitled cause, before

the Honorable BRYAN S. CHAPMAN, DuPage County,

Illinois, recorded via Zoom and transcribed by

Kristin M. Barnes, Certified Shorthand Official Court

Reporter, commencing on the 29th day of September,

2020.

Kristin M. Barnes, CSR
Official Court Reporter
CSR No. 084-004026

1    PRESENT:

2          FRANKLIN LAW GROUP, by
            MR. RYAN ENDSLEY,

3
                appeared on behalf of the Plaintiff;

4

5          SUDEKUM, CASSIDY & SHULRUFF, CHTD., by
            MS. FLORENCE M. SCHUMACHER and

6          MR. FREDERICK J. SUDEKUM, III,

7                appeared on behalf of the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1     THE COURT:  All right.  Good morning, Counsel.

2     MR. ENDSLEY:  Good morning, your Honor.

3     THE COURT:  All right.  This is 20 L 547, It's

4 Nice, Inc. versus State Farm Fire and Casualty.

5      We come on for a 2-615 motion in connection

6 with It's Nice's claim for coverage under the policy.

7      I've had a chance to read the motion, the

8 corresponding briefing, and I know there had been some

9 motions for leave to file supplemental authority.  I

10 have had a chance to look at those motions.

11      I assume both parties are okay with each side

12 submitting their respective -- their respective briefs

13 in support of their -- their respective authority in

14 support of their positions.

15      Is that a fair characterization?

16     MR. ENDSLEY:  Yes, your Honor.  For It's Nice, at

17 least.

18     THE COURT:  Sure.

19     MS. SCHUMACHER:  State Farm as well, your Honor,

20 there's no objection.

21     THE COURT:  All right.  Why don't we go ahead and

22 have the parties state their names for the record.

23     MS. SCHUMACHER:  Sure.

24      Florence Schumacher and Rick Sudekum here on

```
1    behalf of State Farm.

2         THE COURT:  Uh-huh.

3         MR. ENDSLEY:  Ryan Endsley on behalf of It's Nice,

4    Inc.

5         THE COURT:  Okay.  What I'd like to do here, guys,

6    I have spent considerable time with the -- with the

7    courtesy copies.  I've got my tabs.  Like I said, I've

8    read the authority.  I've read the additional authority

9    submitted.

10             I don't necessarily need a regurgitation of

11   the positions already taken in the briefs.  I feel like

12   I have adequately familiarized myself with the parties'

13   positions.

14             I do want to give the parties a chance to

15   make their record here.  I appreciate the issue and

16   that it's kind of a fastly moving issue through the

17   courts right now, and, as a result, I want to give the

18   parties a chance a make their record.

19             That said, I don't necessarily need, you

20   know, sort of, your Honor, this is how insurance

21   policies work.  I mean, tell me whatever you want to

22   tell me.  I may have a question or two for the parties,

23   but I'll let you make your record first.

24             State Farm, it's your motion.  I'll let you
```

1    go ahead if there's anything you want to add.

2         MS. SCHUMACHER:  Sure, your Honor.

3              I am going to briefly run through our

4    argument again, trying to sort of work in some of those

5    cases that have come in more recently.

6              I understand that the court is familiar with

7    insurance policies in general, so we won't -- hopefully

8    won't belabor you with too much elementary insurance

9    law here.

10             Obviously, the plaintiffs know -- or the

11   court knows that the plaintiff is seeking to recover

12   for a business interruption loss resulting from the

13   COVID-19 pandemic and the executive orders.

14             In our view, there are basically two main

15   barriers to plaintiffs being able to state a cause of

16   action.  The first is the lack of accidental direct

17   physical loss and the second is the virus exclusion.

18             The way I look at these, your Honor, it's

19   sort of like -- the lack of accidental direct physical

20   loss is like a 10-foot hurdle and the virus exclusion

21   is like a brick wall.  So even if the plaintiffs could

22   plead accidental direct physical loss, which they

23   can't, they're going to run right into the virus

24   exclusion and there's not going to be any coverage for

that reason either.

THE COURT:  That was my -- that was the one thing
I wondered a little bit about in reading your briefing,
more the structure of your brief.

MS. SCHUMACHER:  Right.

THE COURT:  You led with the virus exclusion, and,
to my mind, there's an insuring agreement here as a
preliminary matter and we only get to the virus
exclusion if the court finds that there is, in fact,
accidental direct physical loss to the property in the
first instance.

You would agree with that?

MS. SCHUMACHER:  I would, your Honor.

THE COURT:  Okay.

MS. SCHUMACHER:  You know, the court is
familiar -- it's the trigger of coverage.  I mean, just
like in a life insurance policy, until you have the
death of the insured, there's no coverage to begin
with.

It's the same for these policies.  They're
property policies, so their triggering coverage is
accidental direct physical loss.  You know, you can't
just skip this part.  It's the trigger of coverage.
It's something that the plaintiff has the burden of

1     proof on.

2          So, in this case, the covered property is the

3     restaurant property, so the first question is, where is

4     the accidental direct physical loss pleaded, and our

5     response, obviously, is that it isn't.

6          So, you know, just looking briefly at the

7     complaint, you know, they allege that there was no

8     virus on the property and their accidental direct

9     physical loss argument is based on loss and use.

10         But, you know, my first point is, it has to

11    be accidental direct physical loss, and I think it's

12    undisputed that there was no difference to this

13    property physically on the day before these executive

14    orders were issued than there was on the day after, so

15    physically the property was exactly the same.

16         So where's the loss?  Where's the loss

17    they're arguing?  They're saying that loss of use is

18    sufficient, that they couldn't use the property in the

19    same way, and that somehow that constitutes accidental

20    direct physical loss to the property, and we disagree

21    with that position.

22         So we believe that the Illinois law and all

23    these cases that have recently come out correctly hold

24    that loss of use of property without any physical

1  change to that property cannot constitute accidental

2  direct physical loss.

3           THE COURT:  Mr. Endsley, at the risk of stealing

4  your thunder, I'm going to ask Ms. Schumacher

5  why don't you go ahead and respond to the western

6  district of Missouri cases that were cited by It's Nice

7  where it looks like some district courts in the western

8  district have found, you know, sort of a lack of

9  definition in the policy for physical damage or loss

10  of -- you know, what are the factual distinctions in

11  those cases, if any --

12           MS. SCHUMACHER:  Right, right.

13           THE COURT:  -- as to why the court should not find

14  those cases persuasive here as opposed to some of the

15  cases you've cited?

16           MS. SCHUMACHER:  Sure.

17                So the first thing I would say, the court

18  says there are courts in the western district of

19  Missouri.  What we actually have is one court -- it's

20  the same judge in the two cases -- who has gone

21  essentially the other way on this accidental direct

22  physical loss question.

23                Those cases are factually distinguishable on

24  two main grounds.  The first is that the plaintiffs in

those cases argue that they had virus on the premises. So the plaintiff in this case has not even alleged that there was any virus present.

The second distinction is in the policy language.  So the trigger of coverage in those policies, in the Studio 417 and the other case, were -- I think I've got the exact language here -- accidental direct -- or accidental physical loss or accidental physical damage.

And so the court in Studio 417 felt that it had to somehow -- you know, focusing on that disjunctive *or*, the court found that it had to give separate meaning to physical loss and physical damage.

That's not the case in our policy.  There's one trigger of coverage, which is accidental direct physical loss to property.

We also have a virus exclusion, which wasn't present in those cases, but I know the court is asking me about physical loss.

So I would say the first and the most important distinguishing factor is, obviously, the pleading in this case -- I think it's in paragraphs, I think, 25 and 36 of the complaint where the plaintiffs specifically deny that they had any virus present on

1    premises.

2            And, again, I would disagree with Studio 417.

3    I'm not sure even in their presence a virus is enough.

4    Other courts have disagreed with that opinion as well,

5    but I think for our purposes in our compliant we have a

6    complaint that alleges the absence of the virus.  And

7    then, obviously, we have a policy that doesn't have

8    that *or* in there that the Studio 417 court seemed to

9    think was determinative.

10       THE COURT:  All right.  Anything else you want to

11   add?

12       MS. SCHUMACHER:  Just jumping briefly into the

13   virus exclusion, your Honor, in case we get there, we

14   have that anti-concurrent causation language which

15   broadly excludes coverage when a loss would not have

16   occurred in the absence of a virus.

17           That language, that anti-concurrent causation

18   language, has been upheld in Illinois.  The virus

19   exclusion clearly applies in this case.  There is no

20   requirement in that policy language that the virus be

21   physically present on the property, like plaintiff

22   alleges.  They're just adding language to the exclusion

23   which isn't present.  The exclusion needs to be applied

24   as written.  It unambiguously excludes a broad range of

losses.  Virus is one of them.

Oh, the argument about, you know, the proliferation issue, that somehow those two subparagraphs of the virus exclusion need to be read together, that's just not correct.  The virus portion of that exclusion is separate.  It says that loss is excluded, current virus, bacteria, or other microorganism.

So, again, I think it's -- I don't see how it could possibly be ambiguous:  I mean, this -- clearly we have a too late chain of causation here.  The virus caused the executive orders which caused the loss and it's excluded under the virus exclusion.

THE COURT:  Okay.  Mr. Endsley, do you want to respond to anything that's -- do you want to respond with anything that's not in your brief?  Or if there's a point or two you want to emphasize, I'm happy to give you a chance to do so.

MR. ENDSLEY:  Thank you, your Honor.

So I just wanted to highlight a couple of things.  In particular, we -- you know, the Studio 417 case, we have the same situation where State Farm elected not to define physical loss or damage.  And, in this case, while counsel has pointed out that this

1    policy only says physical loss, that's really the
2    broader of the two.  Physical damage is what's probably
3    more in line with what State Farm's position is, which
4    is that a physical loss or damage must be a structural
5    alteration.
6            And the fact is that I think the Illinois
7    courts have not limited themselves quite so much to
8    structural physical alteration as State Farm would like
9    the court to believe.  In particular, it's sort of an
10   all squares are rectangles argument.  They cite cases
11   which are saying, you know, a change in color or shape
12   or appearance to the property is a physical loss or
13   damage, which is true, but that's not the only type of
14   physical loss.
15           And I think sort of looking at the asbestos
16   cases really sort of points that out, and State Farm's
17   position really throughout the briefs has been that
18   Illinois law requires a physical alteration to the
19   structure, and that's just not really what Illinois
20   case law actually says.
21           The other thing I'd sort of like to
22   highlight -- and this impinges a little bit on both the
23   virus exclusion and the physical loss or damage -- and
24   that's sort of the nature of an exclusion.  And I know

1    that this is, you know, kind of a basic insurance

2    issue, but the fact is that an exclusion exists to

3    exclude coverage which would otherwise be present.

4            A virus cannot cause physical alteration to

5    the building, as far as I'm aware.  If there's a way

6    that it can be done, State Farm certainly hasn't

7    articulated it.  So at least this policy, as written,

8    clearly seems to contemplate nonphysical alterations

9    which would otherwise be covered causes of loss.

10           And that's a problem for the policy in a

11   couple -- for State Farm in a couple of ways in that

12   State Farm wants to apply the virus exclusion where it

13   was not present.  Even in the absence of a virus

14   exclusion, if the governor had never closed the

15   building, It's Nice could never have made a claim

16   for -- under this policy because the coronavirus

17   existed somewhere.  You know, even if there is

18   absolutely no virus exclusion in a different policy

19   like that, there just wasn't anything affecting It's

20   Nice's property.

21           And separately, with the physical loss or

22   use, when you're reading the policy, a number of these

23   exclusions, including, you know, both the virus

24   exclusion itself as well as the government closure

1    exclusion, really does contemplate under the policy

2    exclusions for nonphysical, nonstructural altering

3    causes of loss.

4            And that, to me, reads -- particularly when

5    State Farm has elected not to define loss or -- you

6    know, physical loss, that's a problem for them because

7    the policies seem to exclude things which wouldn't be

8    covered anyway under State Farm's interpretation, and

9    yet there they are.

10           Reading the policy as a whole and

11   constructing the ambiguities in favor of coverage,

12   certainly at this point dismissal seems premature.

13       THE COURT:  Counsel, do you have a response to the

14   virus exclusion argument that the -- as I understand

15   counsel's argument, it's that the virus -- if we were

16   to take State Farm's proffered definition of physical

17   as understood in insurance contracts, the virus

18   exclusion would never fit that definition because it's

19   never going to alter a physical structure.

20           I'm going to go to paragraph 23 of your

21   motion, page 10, where State Farm says, In cases

22   interpreting the word *physical* in insurance contracts,

23   *physical* is widely held to exclude alleged losses that

24   are intangible or incorporeal, such as detrimental

1    economic impact, unaccompanied by distinct demonstrable

2    physical alteration of property.

3         So how is the virus exclusion consistent with

4    that proffered definition of *physical*?

5         MS. SCHUMACHER:  Well, my first response, your

6    Honor, is I'm not sure we should assume that a virus

7    could never alter a structure.  We're not familiar with

8    every --

9         THE COURT:  Fair enough.

10        MS. SCHUMACHER:  -- virus in the world, so I think

11   that the exclusion -- you know, I look at it as sort of

12   a belt and suspenders approach.  I mean, surely I think

13   this virus is not causing physical damage, but that

14   certainly doesn't mean that there's no virus that could

15   ever develop that doesn't cause physical damage and

16   bodily injury.  We don't know that.  So I think, in a

17   sense, that the insurer clearly wanted to exclude this

18   kind of loss.

19        I think in the event that there is some

20   unexpected virus that comes up in the future that could

21   cause physical damage, I think the insurer is well

22   within its right to, you know, exclude that in the

23   event that that might happen some day.

24        It's clearly in the policy.  The insured was

aware of it. It's a broad exclusion. And, again, I
think their whole question is just based on the
assumption that all viruses are going to be like this
virus, and I just don't think that that's the case.

THE COURT: Counsel, Mr. Endsley, let me ask you a
question.

One of the things, as I've thought about this
case a little bit, I'm worried a little bit or I'm
concerned at least about, were the court to accept your
argument as to loss of use, I'm concerned about a
limiting principle or lack thereof in terms of what is
the underwritten risk here.

And there appears to be, to my mind,
different types of coverage available for loss of use,
whether it is, in fact, civil authority when you think
about the cases right after 9/11 around the World Trade
Center. There's a lot of case law coming down in the
southern district of New York in the second circuit
involving business interruption where civil authority
has retail shops shut down but you've got physical
damage to other property, ingress/egress sorts of
issues.

Without the loss of use, sort of, well,
there's physical accidental physical loss to property

1    if I can't access it, that strikes me, when I look at

2    the policy in its entirety, to be potentially a very

3    different risk than what may have been contemplated

4    here.

5          Is that a fair concern?

6       MR. ENDSLEY:  So I think that is something of a

7    concern.  But to alleviate that a little bit, we're

8    dealing with a fairly unique set of circumstances and I

9    think there sort of still is a principle here.

10        If the governor's orders hadn't actually

11    required closure, if they, you know, had limited how

12    many patrons you could have in the restaurant or if

13    the -- you know, the effect of the general governor's

14    orders to shelter at home had been to reduce income,

15    you know, if we were talking about loss of income,

16    that's not a covered cause of loss.

17        And, in fact, I think some of the cases cited

18    by State Farm sort of indicate what the -- what the

19    difference is -- and those would be the Anchor

20    [phonetic] and Keach [phonetic] cases.  And,

21    particularly, those focused on the difference between

22    when something is actually completely closed down and

23    when it's merely suffered, you know, a loss of business

24    income, and there really is a significant difference

1    here.

2            And the other thing I would sort of add, as

3    far as a policy situation, is I think the tremendous

4    number of lawsuits we've seen from this is sort of an

5    indication that a lot of these insureds thought that

6    this would have been covered, something like this, and

7    learned only late in the game that it wasn't or at

8    least the insurance company thought it wasn't.

9            And I'd just sort of articulate again, you

10   know, the basic principle that ambiguities in the

11   policy are construed against the drafter.  State Farm

12   was the one who got to say what this policy looked

13   like, State Farm was the one who got to draft the

14   language of the policy, and, frankly, had put a lot

15   more thought into it than any of their insureds.

16           So I think to say that, you know, this wasn't

17   in the contemplation of the parties, it was at least a

18   little bit.  State Farm has a number of exclusions

19   which nearly but do not quite apply.  They were able to

20   draft around this.

21           And, frankly, exclusions exist in certain

22   policies which do address this specific concern.  We've

23   reviewed a couple of them from client -- from potential

24   clients who wanted coverage and actually saying that if

1    there's a government closure order because of a

2    pandemic, no coverage.

3         So there are ways for the insurer to protect

4    themselves from this, but in this case it's the insured

5    who really had this dropped on them unexpectedly and is

6    now having to litigate.

7         THE COURT:  Well, certainly, obviously, companies

8    and businesses around the world and certainly the

9    country and certainly Illinois are faced with a

10   remarkable predicament through largely no cause of

11   their own, if at all, as a result of the pandemic.

12        Let me be very clear.  I am not -- when I ask

13   the question about the limiting principle, I am not

14   suggesting that the court is trying to ascertain the

15   intent of the parties at this point.  I'm simply trying

16   to ascertain whether or not there's a reasonable

17   interpretation on the other side.

18        But wouldn't your argument, Mr. Endsley, be a

19   bit stronger if the definition or if the insuring

20   agreement language said insure for all accidental

21   direct physical loss of covered property as opposed to

22   to?

23        In other words, it's talking about -- I'm

24   concerned that we're reading direct physical to

1   property.  We're kind of just pretending that it

2   doesn't say what it -- what it clearly says and we're

3   kind of saying, well, loss of property or loss to

4   property, same thing, whatever.

5           Wouldn't you have a stronger argument if it

6   said loss of property?

7       MR. ENDSLEY:  In this case, I'm actually not sure

8   that we would, your Honor.

9           It's Nice still has the property, but the

10  property suffered a loss of use and that was a loss to

11  the property.  It's Nice hasn't -- you know, the

12  property isn't gone.  It's Nice has, in fact, recently

13  resumed business operations --

14      THE COURT:  So let me ask you a question.

15          If I said, when I think loss to the property,

16  I think the roof is blown off; okay?  That's what I

17  think of just -- at the very least, at a superficial

18  level.

19          If you're telling me a closing of the doors

20  by executive order is a loss to the property, help me

21  understand why that's the same thing.

22      MR. ENDSLEY:  Well, I think you're certainly

23  correct that, you know, when we think of -- that is

24  classic losses.

1        THE COURT:  That is, to my mind, closer to a loss

2    of property.  It's a functional loss of property, not

3    to property.

4        MR. ENDSLEY:  I guess the best argument I can sort

5    of think of, just off the spur of the moment, relates

6    to the fact that the type of property it is is what

7    affected the loss and that's -- because it's a

8    restaurant, this was a different type of loss.  If this

9    was just being used as residential housing, there is no

10    loss to the property.

11        So State Farm insured a particular type of

12    business and a particular -- that particular type was a

13    restaurant which was affected, and that impacted this

14    property.  That was a loss to this specific property

15    rather than a removal.

16        So to some extent, you know, if it said *loss*

17    *of property*, that, to me, almost suggests that

18    something -- a little more of the structural alteration

19    argument State Farm prefers, which is almost that

20    something was removed from the property or just ceased

21    to exist on the property -- because it was burned up or

22    something -- whereas I think *to property* sort of

23    suggests that it's anything that affects, you know,

24    that business property.  It wasn't just the -- you

1    know, this wasn't just a title policy or something like

2    that.  This was a business coverage policy.

3         THE COURT:  It doesn't say anything is physical;

4    right?

5         MR. ENDSLEY:  It does say physical.

6         THE COURT:  I mean, it's not any conceivable way

7    you're unable to use the property in the way you see

8    fit.  It's got to be direct physical loss.  And, I

9    guess, your view is loss of use, there's a physical

10   displacement; right?  That's --

11        MR. ENDSLEY:  Yes.

12        THE COURT:  -- your position?

13             Okay.  Ms. Schumacher, if there's anything

14   you want to respond to, I'll give you the last word.

15        MS. SCHUMACHER:  Sure.  There are many things.

16   I'm going to try to stick to a couple.

17             I think the Turek court actually discussed

18   that *physical loss to* concept and I think it held that

19   *to* implies contact and *physical* implies physical

20   contact, direct physical loss to property.

21             And I looked in the dictionary.  They gave

22   examples like a right uppercut to the jaw or applying

23   varnish to a surface.  Whatever theory they have about

24   their loss not being able to use the property, that

1    simply is not physical loss to that property.

2            And I just want to briefly touch on -- the

3    court is concerned about the breadth of their

4    interpretation.  So the first thing they said is, well,

5    this is a different situation because the restaurant

6    was required to be closed.

7            I would point out that in the executive

8    orders they did not close restaurants.  Restaurants

9    were permitted to stay open for takeout or delivery.

10   So regardless of whether they chose to close the

11   restaurant, even under their complaint, they weren't

12   required to.  So this is not a situation where

13   restaurants were closed.

14           The second and more broad point I would make,

15   your Honor, is that under their theory of accidental

16   direct physical loss, let's just say after COVID is

17   over the restaurant is open until 1:00 a.m.  There's an

18   ordinance that says restaurants have to close at

19   midnight now.  According to their theory, they now have

20   a loss of income claim because the restaurant has to

21   close an hour early because, according to them, there

22   doesn't have to be any physical impact; it just has to

23   affect the use of their property.

24           So, again, I agree with the court's concern

1    that their interpretation is way too broad and it

2    brings many more things into coverage than are intended

3    under a property policy which covers accidental direct

4    physical loss and then loss of income once that's

5    happened.  But you just can't skip that step.

6          And I think that's all I have.  I know the

7    court is familiar with all of this and there was a lot

8    that was said, but I'd like to keep it as brief as I

9    can.  So I think unless the court has any additional

10    questions, I think we've made our point.

11       THE COURT:  I think we -- I just want to make sure

12    all the parties agree that regardless of the coverage

13    form under the all risk policy, everyone agrees that

14    direct physical loss is required; right?

15       MR. ENDSLEY:  Yes.

16       THE COURT:  That phrase, that is an insuring

17    agreement that attaches to all.  You know, sometimes

18    these all risk policies, there's all these amendments,

19    you know, there's the general exclusions and then

20    there's the exclusions within the broad form coverage

21    and there's exclusions within that and those don't

22    apply to the general -- you know, so that was my review

23    of the policy, that there was no separate insuring

24    agreement, everything goes back to Section 1 property

1    insuring agreements, direct physical loss requirement.

2         MS. SCHUMACHER:  Yes.

3         THE COURT:  Okay.

4         MR. ENDSLEY:  Yeah, I believe there was a little

5    bit of confusion that we were maybe trying to get

6    coverage under the civil -- civil authority provision,

7    but that was --

8         THE COURT:  Well, as I understand your argument,

9    you'll take coverage wherever you can find it; right?

10        MR. ENDSLEY:  Yes, that's correct.

11             And that all relates back to the all risk

12   direct physical loss.

13        THE COURT:  Right.  Okay.  Very good.  Thank you.

14             Okay.  The court is in a position to rule on

15   this today.  The question presented by a 2-615 motion

16   to dismiss is whether sufficient facts are contained in

17   the pleadings that, if proved, would entitle the

18   plaintiff to relief.  That's Evers versus Edwards

19   Hospital, 247 Ill. App. 3d 717.

20             A motion to dismiss under Section 615 admits

21   all well-pleaded facts but does not admit conclusions

22   of law or conclusions of fact not supported by

23   allegations of specific fact.

24             Exhibits -- I assume the policy was, in fact,

attached to the complaint?

    MS. SCHUMACHER:  It was -- your Honor, it was either attached or filed by agreement.

        I have two different cases.  One they attached a partial policy and then --

    MR. ENDSLEY:  Yeah, I --

    MS. SCHUMACHER:  Was yours the partial policy?

    MR. ENDSLEY:  Yeah, I believe it was attached by agreement.

    MS. SCHUMACHER:  Okay.

    THE COURT:  The court is --

    MR. ENDSLEY:  There was --

    THE COURT:  The parties are asking the court to consider the policy, right --

    MR. ENDSLEY:  Yes.

    MS. SCHUMACHER:  Yes, your Honor.

    THE COURT:  -- for purposes of this motion?

        All right.  So the policy is an exhibit to the complaint for purposes of this motion.

        Exhibits are part of the complaint to which they are attached and the factual allegations contained within an exhibit attached to a complaint serve to negate inconsistent allegations of fact contained within the body of the complaint.

1    I say that because, in some ways, this
2    operates almost more like a 12(b)(6) than -- most 615's
3    are sort of, if you haven't pled this element, you
4    haven't pled that element, and this operates more sort
5    of a -- whether or not there is a claim upon which
6    relief can be granted based on the complaint itself.
7    And, for that reason, I point out simply that
8    the exhibits to the complaint, which, in this case,
9    includes the policy, the parties have asked the court
10   to consider that as well.
11   Okay.  Having said all of that, the critical
12   language here, first, is the direct physical loss
13   language, and the court finds that direct physical loss
14   unambiguously requires some form of actual physical
15   damage to the insured premises to trigger coverage.
16   The words *direct* and *physical*, which modify
17   the word *loss*, ordinarily connote actual demonstrable
18   harm of some form to the premises itself rather than
19   force the closure of the premises for reasons
20   extraneous to the premises itself or adverse business
21   consequences that flow from such closure.
22   Defense counsel -- I'm sorry, the insurance
23   counsel points out here that Illinois courts have not
24   squarely addressed direct physical loss in this

context, but I do want to note in cases interpreting
the word *physical* in insurance contracts, *physical* is
widely held to exclude alleged losses that are
intangible or incorporeal in Illinois, such as
detrimental economic impact unaccompanied by a distinct
demonstrable physical alteration of the property.

That's One Place Condo, LLC, versus
Travelers, 2015 Westlaw, Northern District of Illinois,
applying Illinois law.

The other case here that, I think, is
particularly useful is, in fact, Judge Gettleman's
decision in the northern district of -- I want to get
this right -- Sandy Point Dental v. Cincinnati
Insurance.  This is 2020 Westlaw 5360465 dealing with
very similar facts and similar policy language.

In this case, the court finds, just as in
that case, plaintiff simply cannot show any such loss
as a result of either inability to access its own
office or the presence of the virus on its physical
surface, the latter of which here plaintiff fails to
allege in its complaint.

I don't think that's in dispute.  There's no
argument that the coronavirus was, in fact, on the
surface of the property.  The plaintiff has not pled

1  any facts showing physical alteration or structural

2  degradation of the property, which is required to

3  trigger coverage under this all risks policy.

4          The court wants to note that in addressing

5  this insuring agreement argument, this holding is

6  consistent with other courts that have evaluated

7  whether the coronavirus causes property damage

8  warranting insurance coverage.

9          Again, I want to reference 20 L -- I'm sorry,

10  not 20 L.  2020 Westlaw 5360465.  That's Sandy Point

11  Dental versus Cincinnati Insurance.

12          I want to further note that Social Life

13  Magazine versus Sentinel Insurance Company, denying a

14  motion for preliminary injunction because the

15  coronavirus does not cause direct physical loss;

16  therefore, no coverage was required.  The coronavirus,

17  quote, damages lungs.  It doesn't damage printing

18  presses, close quote.

19          Diesel Barbershop versus State Farm Lloyds,

20  2020 Westlaw 4724305, Western District of Texas,

21  August 13, 2020, granting a motion to dismiss because

22  the coronavirus did not cause a direct physical loss

23  and, quote, the loss needs to have been a distinct

24  demonstrable physical alteration of the property, close

1    quote.

2            I further want to direct the parties'

3    attention to Gavrilides Management versus Michigan

4    Insurance Company.  This is a state court of Michigan

5    handing down a decision last month that was cited by

6    State Farm in this case explaining that direct physical

7    loss to property requires tangible alteration or damage

8    that impacts the integrity of the property and

9    dismissing the case because plaintiff failed to allege

10   that the coronavirus had any impact to the premises.

11           I want to point out that these are not

12   controlling cases for purposes of an Illinois state

13   court; however, the court finds that these cases just

14   cited are, in fact, consistent with Illinois courts

15   treating of physical damage under insurance policies.

16           And, of course, there are meaningful

17   differences at times between first and third party

18   policies and first and third policy claims; however,

19   the court finds that there is a consistent line of

20   reasoning by Illinois courts as far as what physical

21   damage must mean for purposes of insurance coverage in

22   this case.

23           In essence, to quote Judge Gettleman in the

24   Sandy Point Dental Case, plaintiff here seeks coverage

1     for financial losses as a result of closure orders.

2     And I don't think anybody really disagrees with that

3     here.

4            The coronavirus has not physically altered

5     the appearance, shape, color, structure, or other

6     material dimension of the property and, as a result, it

7     doesn't come within the insuring agreement and, as a

8     result, plaintiff has failed to plead a direct physical

9     loss, which is a prerequisite for coverage.

10           However, I do want to point out here that

11     even if, even if, plaintiff had, in fact, been able to

12     plead within the insuring agreement -- that this claim

13     comes within the insuring agreement, the court does

14     find that the virus exclusion applies.

15           Now, the virus exclusion, which is Exclusion

16     J under Section 1 of the policy, states as follows --

17     and there's important, what we'll call, lead-in

18     language that I want to direct the parties' attention

19     to.  The lead-in language under Section 1 exclusions,

20     which applies to all coverage forms under this all

21     risks policy, all coverage forms incorporate Section 1,

22     the lead-in language states as follows:  We do not

23     insure under any coverage for any loss which would not

24     have occurred in the absence of one or more of the

1    following excluded events.

2          We do not insure for such loss regardless of,

3    A, the cause of the excluded event; or, B, other causes

4    of loss; or, C, whether other causes acted concurrently

5    or in any sequence with the excluded event to produce

6    the loss; or, D, whether the event occurred suddenly or

7    gradually, involves isolated or widespread damage,

8    arises from natural or external forces, or occurs as a

9    result of any combination of these, and it begins to

10    list the exclusions.

11          So the virus exclusion is Exclusion J.  The

12    heading, which does not control, says fungi, virus, or

13    bacteria.  Paragraph 1 states, Growth, proliferation,

14    spread, or presence of fungi or wet or dry rot or, new

15    paragraph, 2, Virus, bacteria, or other microorganism

16    that induces or is capable of inducing physical

17    distress, illness, and disease.

18          For our purposes, those are the relevant

19    provisions of the virus exclusion that needs to be

20    addressed here.  First, the court finds that the

21    growth, proliferation, spread, or presence is not

22    required for purposes of applying the virus exclusion

23    because that is in a separate paragraph designed to

24    address fungus or fungi.  There are not just one but

two disjunctive *or's* in between fungus and virus

because it goes fungus -- or states fungus or wet or

dry rot or and then a new paragraph starting with the

word *virus* enumerated as number two.

So the court finds that it doesn't have to

establish a growth of a virus, just simply the idea of

a virus, the fact that a virus that is capable of

inducing physical distress, illness, or disease.

Even if -- if, in fact, this was some kind of

physical -- accidental physical damage, physical loss

coming within the insuring agreement, the virus

exclusion applies because Subsection C of the lead-in

language says this virus exclusion applies whether

other causes, executive orders, acted concurrently or

in any sequence with the excluded event to produce the

loss.

Here, I think everyone would agree absent the

virus, absent the virus, there would be no executive

orders, and so because C says this exclusion would

apply even where the sequence of the ordering with

other causes isn't entirely known or isn't entirely

clear or happens one two or two one, it still applies.

Furthermore, whether or not a virus could, in

fact, alter the physical structure, I think that's a

1    much -- that's not entirely clear at all that a virus

2    could.

3         And that's plaintiff's -- or I'm sorry,

4    insured's argument is the virus exclusion doesn't make

5    any sense for a sort of physical alteration requirement

6    of physical damage -- or a loss of, I should say --

7    physical loss because a virus would never alter the

8    physical structure.

9         The court doesn't agree with that.  Virus,

10   bacteria, and microorganisms can exist in, in fact, a

11   meaningful way, and I think there's a strain of thought

12   out there that at one time was dominant -- it still may

13   be true to a certain extent -- that this virus can

14   exist on surfaces.

15        So even if the loss of use because of

16   coronavirus could constitute, the virus exclusion would

17   still apply -- could constitute physical -- accidental

18   physical loss, direct physical loss, I should say --

19   the virus exclusion applies.

20        And so for those reasons, the court is going

21   to grant the motion to dismiss.

22        I want to point out -- or I do want to

23   address the authority provided by Harold's Chicken --

24   It's Nice, Inc., d/b/a Harold's Chicken.  A couple

1    things, I think, are worth pointing out.

2           One is the State Farm language here -- not

3    only are those cases from the western district and, as

4    a result, they're not controlling, the court believes

5    or is of the opinion that the cases relied upon for its

6    ruling today are more consistent with Illinois law as

7    it exists with respect to this issue.

8           Furthermore, the policy language was

9    different in those western district cases.  And that's

10   not to say that the result would be different if you

11   had identical language, but I do think that's different

12   language.

13          And, moreover, and perhaps importantly, the

14   court was evaluating a 12(b)(6) motion in which the

15   insureds in that case allege the presence of COVID on

16   the property.  And, to the court's mind, that is a --

17   that's a meaningful distinction here.

18          And, again, there's no virus exclusion in

19   that policy that the court would have had to have

20   considered as well and we don't know what the court

21   would have done in that case.

22          But I do think, at least for purposes of the

23   insuring agreement argument, those cases are

24   distinguishable without regarding -- without, you know,

1    advising as to what the result would be in this court.

2    But I do think those are different cases and they need

3    to be treated differently as such.

4             And so, for those reasons, the court is going

5    to go ahead and grant the motion both with respect to

6    the insuring agreement argument as well as with respect

7    to the virus exclusion.

8             I do want to point out, for the record, the

9    insured does not seem to argue -- kind of seems to have

10   one foot in and one foot out on civil authority.

11   They're happy to find civil authority coverage if it

12   exists, but they're not specifically asking for it.

13            But I want to point out, for the record,

14   that, as noted above, the policy's civil authority

15   coverage applies only if there is a covered cause of

16   loss, meaning direct physical loss, again, going back

17   to direct physical loss to property other than the

18   plaintiff's property.

19            Just as the coronavirus did not cause direct

20   physical loss to plaintiff's property here, the

21   complaint has not and likely could not allege that the

22   coronavirus caused direct physical loss to other

23   property.  By the policy's own terms, the civil

24   authority coverage then does not apply.

1    So with that having been said, I'm granting

2  the motion.  You know, I'm kind of -- do the parties

3  want a dismissal with prejudice?

4    MS. SCHUMACHER:  Your Honor, we are asking for a

5  dismissal with prejudice, the reason being their claim

6  is for the loss of income due to the executive orders

7  which is caused by the virus, and without alleging a

8  completely different kind of claim, there's no set of

9  facts that they're going to be able to allege that's

10  going to avoid that result.

11    The executive orders are full of references

12  to the virus.  The chain of causation is strong.  The

13  virus exclusion is present.  And, again, the same thing

14  with the physical damage issue.  There's no claim that

15  there was any structural alteration to the property.

16    So I think in this case, your Honor, on that

17  basis, I don't think there's any way they're going to

18  be able to plead around either of those issues, and so

19  we are asking for a dismissal with prejudice.

20    THE COURT:  Mr. Endsley, any response to that or

21  are you in agreement that this is time for other minds

22  to evaluate this claim?

23    MR. ENDSLEY:  Yeah, your Honor, that's probably

24  correct.  I don't think we can change the pleading such

1  that -- to get around the issues that you're finding

2  are insurmountable.

3  THE COURT:  I don't disagree.  It is a 615, and so

4  I do want to just at least give the parties the

5  opportunity to request without -- whether or not I give

6  that is a different issue, but it sounds like the

7  parties are of one mind and the court is in agreement

8  that this dismissal for this type of a 615 motion is

9  and should be with prejudice, and the court will enter

10  such an order.

11  MS. SCHUMACHER:  Thank you, your Honor.

12  THE COURT:  Okay.

13  MR. ENDSLEY:  Thank you, your Honor.

14  THE COURT:  Thank you, guys.  Thank you very much

15  for your time and energy on this.  I want to commend

16  the parties.  I know this is a very interesting issue

17  under very -- a very unique set of facts.

18  MS. SCHUMACHER:  Thank you, your Honor.

19  MR. ENDSLEY:  Thank you, your Honor.

20  THE COURT:  Thank you.

21                    (Which were all the proceedings had at

22                    the hearing of the above-entitled

23                    cause, this date.)

24

1          IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT

2                  DU PAGE COUNTY, ILLINOIS

3

4

5            I, KRISTIN M. BARNES, do hereby certify that

6   the foregoing Report of Proceedings, consisting of

7   Pages 1 to 39, inclusive, was reported in shorthand by

8   me via Zoom videoconferencing, and the said Report of

9   Proceedings is a true, correct and complete transcript

10  of my shorthand notes so taken at the time and place

11  hereinabove set forth.

12

13

14

15       _____

16               Official Court Reporter
            Eighteenth Judicial Circuit of Illinois

17                   DuPage County
             CSR License No. 084-004026

18

19

20

21

22

23

24